TERADYNE, INC., Plaintiff, Appellee,

v.

TELEDYNE INDUSTRIES, INC., et al.,
Defendants, Appellants.

TERADYNE, INC., Plaintiff, Appellant,

v.

TELEDYNE INDUSTRIES, INC., et al.,
Defendants, Appellees.

Nos. 81–1509, 81–1510.

United States Court of Appeals,
First Circuit.

Argued Dec. 11, 1981.

Decided March 30, 1982.

James E. McGuire, with whom Goodwin, Procter & Hoar, Boston, Mass., was on brief, for Teledyne Industries, Inc., Etc.

Bernard J. Bonn, III., with whom Testa, Hurwitz & Thibeault, Boston, Mass., was on brief, for Teradyne, Inc.

Before CAMPBELL and BOWNES, Circuit Judges, and WYZANSKI,* Senior District Judge.

WYZANSKI, Senior District Judge.

In this diversity action, Teradyne, Inc. sued Teledyne Industries, Inc. and its subsidiary for damages pursuant to § 2–708(2) of the UCC, Mass.Gen.Laws c. 106 § 2–708(2) [hereafter "§ 2–708(2)"].[1] Teledyne does not dispute the facts that it is bound as a buyer under a sales contract with Teradyne, that it broke the contract, and that Teradyne's right to damages is governed by § 2–708(2). The principal dispute concerns the calculation of damages.

The district court referred the case to a master whose report the district court approved and made the basis of the judgment here on appeal.

The following facts, derived from the master's report, are undisputed.

On July 30, 1976 Teradyne, Inc. ["the seller"], a Massachusetts corporation, entered into a Quantity Purchase Contract ["the contract"] which, though made with a subsidiary, binds Teledyne Industries, Inc., a California corporation ["the buyer"]. That contract governed an earlier contract resulting from the seller's acceptance of the buyer's July 23, 1976 purchase order to buy at the list price of $98,400 (which was also its fair market value) a T–347A transistor test system ["the T–347A"]. One consequence of such governance was that the buyer was entitled to a $984 discount from the $98,-400 price.

The buyer canceled its order for the T–347A when it was packed ready for shipment scheduled to occur two days later. The seller refused to accept the cancellation.

The buyer offered to purchase instead of the T–347A a $65,000 Field Effects Transistor System ["the FET"] which would also have been governed by "the contract." The seller refused the offer.

After dismantling, testing, and reassembling at an estimated cost of $614 the T–347A, the seller, pursuant to an order that was on hand prior to the cancellation, sold it for $98,400 to another purchaser [hereafter "resale purchaser"].

Teradyne would have made the sale to the resale purchaser even if Teledyne had not broken its contract. Thus if there had been no breach, Teradyne would have made two sales and earned two profits rather than one.

---

* Of the District of Massachusetts, sitting by designation.

1. Section 2 708(1) and (2) of the Uniform Commercial Code, Mass.Gen.Laws c. 106 § 2–708(1) and (2) provide:

*Seller's Damages for Non-acceptance or Repudiation.* (1) Subject to subsection (2) and to the provisions of this Article with respect to proof of market price (section 2–723), the measure of damages for non-acceptance or repudiation by the buyer is the difference between the market price at the time and place for tender and the unpaid contract price together with any incidental damages provided in this Article (section 2–710), but less expenses saved in consequence of the buyer's breach.

(2) If the measure of damages provided in subsection (1) is inadequate to put the seller in as good a position as performance would have done then the measure of damages is the profit (including reasonable overhead) which the seller would have made from full performance by the buyer, together with any incidental damages provided in this Article (section 2–710), due allowance for costs reasonably incurred and due credit for payments or proceeds of resale.

The seller was a volume seller of the equipment covered by the July 23, 1976 purchase order. The equipment represented standard products of the seller and the seller had the means and capacity to duplicate the equipment for a second sale had the buyer honored its purchase order.

Teradyne being of the view that the measure of damages under § 2–708(2) was the contract price less ascertainable costs saved as a result of the breach—see *Jericho Sash and Door Company, Inc. v. Building Erectors, Inc.*, 362 Mass. 871, 872, 286 N.E.2d 343, (1972) [hereafter *"Jericho"*]—offered as evidence of its cost prices its Inventory Standards Catalog ["the Catalog"]—a document which was prepared for tax purposes not claimed to have been illegitimate, but which admittedly disclosed "low inventory valuations." Relying on that Catalog, Teradyne's Controller, McCabe, testified that the *only* costs which the seller saved as a result of the breach were:

| | |
|---|---|
| direct labor costs associated with production | $ 3,301 |
| material charges | 17,045 |
| sales commission on one T-347A | 492 |
| expense | 1,800 |
| TOTAL | $22,638 |

McCabe admitted that he had not included as costs saved the labor costs of employees associated with testing, shipping, installing, servicing, or fulfilling 10-year warranties on the T–347A (although he acknowledged that in forms of accounting for purposes other than damage suits the costs of those employees would not be regarded as "overhead"). His reason was that those costs would not have been affected by the production of one machine more or less. McCabe also admitted that he had not included fringe benefits which amounted to 12% in the case of both included and excluded labor costs.

During McCabe's direct examination, he referred to the 10–K report which Teradyne had filed with the SEC. On cross-examination McCabe admitted that the 10–K form showed that on average the seller's revenues were distributed as follows:

| | |
|---|---|
| profit | 9% |
| "selling and administrative" expense | 26% |
| interest | 1% |
| "cost of sales and engineering" (including substantial research and developmental costs incidental to a high technology business) | 64% |

He also admitted that the average figures applied to the T–347A.

Teledyne contended that the 10–K report was a better index of lost profits than was the Catalog. The master disagreed and concluded that the more appropriate formula for calculating Teradyne's damages under § 2–708(2) was the one approved in *Jericho, supra* — "'gross profit' including fixed costs but not costs saved as a result of the breach." He then stated:

> In accordance with the statutory mandate that the remedy "be liberally administered to the end that the aggrieved party may be put in as good a position as if the other party had fully performed," M.G.L. c. 106 § 1–106(1), I find that the Plaintiff has met its burden of proof of damages, and has established the accuracy of its direct costs and the ascertainability of its variable costs with reasonable certainty and "whatever definiteness and accuracy the facts permit." *Comment 1* to § 1–106(1) of the UCC.

In effect, this was a finding that Teradyne had saved only $22,638 as a result of the breach. Subtracting that amount and also the $984 quantity discount from the original contract price of $98,400, the master found that the lost "profit (including reasonable overhead)" was $74,778. To that amount the master added $614 for "incidental damages" which Teradyne incurred in preparing the T–347A for its new customer. Thus he found that Teradyne's total § 2–708(2) damages amounted to $75,392.

The master declined to make a deduction from the $75,392 on account of the refusal of the seller to accept the buyer's offer to purchase an FET tester in partial substitution for the repudiated T–347A.

At the time of the reference to the master, the court, without securing the agreement of the parties, had ordered that the master's costs should be paid by them in equal parts.

Teradyne filed a motion praying that the district court (1) should adopt the master's report allowing it to recover $75,392, and (2) should require Teledyne to pay all the master's costs. The district court, without opinion, entered a judgment which grants the first prayer and denies the second. Teledyne appealed from the first part of the judgment; Teradyne appealed from the second part.

1. The parties are agreed that § 2–708(2) applies to the case at bar. Inasmuch as this conclusion is not plain from the text, we explain the reasons why we concur in that agreement.

■ Section 2–708(2) applies only if the damages provided by § 2–708(1) are inadequate to put the seller in as good a position as performance would have done. Under § 2–708(1) the measure of damages is the difference between unpaid contract price and market price. Here the unpaid contract price was $97,416 and the market price was $98,400. Hence no damages would be recoverable under § 2–708(1). On the other hand, if the buyer had performed, the seller (1) would have had the proceeds of two contracts, one with the buyer Teledyne and the other with the "resale purchaser" and (2) *it seems* would have had in 1976–7 one more T–347A sale.

A literal reading of the last sentence of § 2–708(2)—providing for "due credit for payments or proceeds of resale"—would indicate that Teradyne recovers nothing because the proceeds of the resale exceeded the price set in the Teledyne-Teradyne contract. However, in light of the statutory history of the subsection, it is universally agreed that in a case where after the buyer's default a seller resells the goods, the proceeds of the resale are not to be credited to the buyer if the seller is a lost volume seller [2]—that is, one who had there been no breach by the buyer, could and would have had the benefit of both the original contract and the resale contract.[3]

Thus, despite the resale of the T–347A, Teradyne is entitled to recover from Teledyne what § 2–708(2) calls its expected "profit (including reasonable overhead)" on the broken Teledyne contract.[4]

2. The term "lost volume seller" was apparently coined by Professor Robert J. Harris in his article *A Radical Restatement of the Law of Seller's Damages: Sales Act and Commercial Code Results Compared*, 18 Stan.L.Rev. 66 (1965). The terminology has been widely adopted. *See Famous Knitwear Corp. v. Drug Fair Inc.*, 493 F.2d 251, 254 n.5 (4th Cir. 1974); *Snyder v. Herbert Greenbaum & Assoc. Inc.*, 38 Md.App. 144, 157, 380 A.2d 618, 624 (1977); *Publicker Industries, Inc. v. Roman Ceramics Corp.*, 652 F.2d 340, 346 (3rd Cir. 1981). *See* Restatement (Second) Contracts § 347 Comment f; J. White and R. Summers, Uniform Commercial Code, 2d ed. (1980) [hereafter "White and Summers"] § 7–9, particularly p. 276 first full paragraph.

3. *Famous Knitwear Corp. v. Drug Fair Inc.*, *supra*, 493 F.2d at 254 n.7; *Snyder v. Herbert Greenbaum & Assoc. Inc.*, *supra*, 380 A.2d 625–626; *Neri v. Retail Marine Corp.*, 30 N.Y.2d 393, 399, 334 N.Y.S.2d 165, 285 N.E.2d 311, 314 (1972). *See* White and Summers, § 7–13, particularly 284–285.

4. *Ibid.* White and Summers at pp. 284–285 give the following suppositious case which parallels the instant case. Boeing is able to make and sell in one year 100 airplanes. TWA contracts to buy the third plane off the assembly line, but it breaks the contract and Boeing resells the plane to Pan Am which had already agreed to buy the fourth plane. Because of the breach Boeing sells only 99 aircraft during the year. White and Summers say that the right result, despite the words of § 2–708(2), is that Boeing recovers from TWA both the net profit and the overhead components of the TWA contract price, no credit being given for any part of the proceeds Boeing received from its sale to Pan Am.

We do not agree with the third sentence in the following Comment f to Restatement (Second) Contract § 347 insofar as it indicates that a volume seller like Teradyne may recover from a defaulting buyer only the lost *net* profit on the original contract.

f. *Lost volume*. Whether a subsequent transaction is a substitute for the broken contract sometimes raises difficult questions of fact. If the injured party could and would have entered into the subsequent contract, even if the contract had not been broken, and could have had the benefit of both, he can be said to have "lost volume" and the subsequent transaction is not a substitute for the broken contract. The injured party's damages are then based on the *net* profit that he has lost as a result of the broken contract. Since entrepreneurs try to operate at optimum capacity, however, it is possible that an additional transaction would not have been

2. Teledyne not only "does not dispute that damages are to be calculated pursuant to § 2–708(2)" but concedes that the formula used in *Jericho Sash & Door Co. v. Building Erectors Inc.*, 362 Mass. 871, 286 N.E.2d 343 (1972), for determining lost profit including overhead—that is, the formula under which direct costs of producing and selling manufactured goods are deducted from the contract price in order to arrive at "profit (including reasonable overhead)" as that term is used in § 2–708(2)—"is per-

missible provided all variable expenses are identified." [5]

What Teledyne contends is that all variable costs were not identified because the cost figures came from a catalog, prepared for tax purposes, which did not fully reflect all direct costs. The master found that the statement of costs based on the catalog was reliable and that Teledyne's method of calculating costs based on the 10–K statements was not more accurate. Those findings are not clearly erroneous and therefore

---

profitable and that the injured party would not have chosen to expand his business by undertaking it had there been no breach. It is sometime assumed that he would have done so, but the question is one of fact to be resolved according to the circumstances of each case. See illustration 16. *See also Uniform Commercial Code § 2–708(2).* [Emphasis added.]

Limiting the volume seller's recovery to lost net profit does not permit the recovery of reasonable overhead for which provision is specifically made in the text of § 2–708(2). The reason for the allowance of overhead is set forth in *Vitex Mfg. Corp. v. Caribtex Corp.*, 377 F.2d 795, 799 (3rd Cir. 1967) [hereafter "Vitex"]:

..... as the number of transaction[s] over which overhead can be spread becomes smaller, each transaction must bear a greater portion or allocate share of the fixed overhead cost. Suppose a company has fixed overhead of $10,000 and engages in five similar transactions; then the receipts of each transaction would bear $2000 of overhead expense. If the company is now forced to spread this $10,000 over only four transactions, then the overhead expense per transaction will rise to $2500, significantly reducing the profitability of the four remaining transactions. Thus, where the contract is between businessmen familiar with commercial practices, as here, the breaching party should reasonably foresee that his breach will not only cause a loss of "clear" profit, but also a loss in that the profitability of other transactions will be reduced. *Resolute Ins. Co. v. Percy Jones, Inc.*, 198 F.2d 309 (C.A.10, 1952); Cf. *In re Kellett Aircraft Corp.*, 191 F.2d 231 (C.A.3, 1951) .....

*Vitex* represents the law of Massachusetts. *F. A. Bartlett Tree Expert Co. v. Hartney*, 308 Mass. 407, 412, 32 N.E.2d 237 (1941); *Roblin Hope Industries Inc. v. J. A. Sullivan Corp.*, Mass.App.Ct.Adv.Sh. [1980] 2229, 2232, 413 N.E.2d 1134.

5. We concur in the view that Massachusetts law determines whether a particular formula for calculating damages under a Massachusetts statute is permissible. *Salemme v. Ristaino*,

587 F.2d 81, 87 (1st Cir. 1978). But we are not certain that the *Jericho* court purported to declare that in every § 2–708(2) case the use of the formula would be permissible.

An examination of the original record in *Jericho* shows that the seller offered evidence of the contract price and of virtually all the expenses that were saved by him as a result of the breach, but he did not offer evidence showing separate figures for profit and for overhead. The trier of fact allowed as damages the contract price less the direct costs because "as a general principle, it may be stated that the loss will be measured by the contract price less those costs and expenses directly attributable to the performance of the contract." On appeal, the Massachusetts Supreme Judicial Court stated that "The sole question presented is whether the trial judge erred in allowing damages for 'profit (including reasonable overhead),' under G.L. c. 106, § 2–708(2), in the absence of evidence showing separate figures for profit and for overhead." Inspection of the briefs reveals that that statement is not accurate. Other questions were presented. But the parties nowhere raised the issue whether the method—contract price less direct costs—which was proper as a general principle would be proper where the seller had expenses which were not direct costs (say, for example, a rental charge, or an executive officer's salary, or research expenses) which either were in excess of a reasonable amount or were not properly regarded as overhead reasonably related to the goods covered by the contract.

In light of the concession made in Teledyne's brief, we need not determine whether in a case where reasonableness of overhead was an issue the Massachusetts courts would distinguish *Jericho*, or would declare that if part or all of a particular item is not recoverable as "reasonable overhead" it is nonetheless recoverable as part of "the profit ... which the seller would have made from full performance," or would permit the use of the formula and leave it to the trier of fact to decide whether the results which flowed from its application were credible.

we may not reverse the judgment on the ground that allegedly the items of cost which were deducted are unreliable. Fed. R.Civ.P. 52(a); *Merrill Trust Co. v. Bradford*, 507 F.2d 467, 468 (1st Cir. 1974); *Van Alen v. Dominick & Dominick, Inc.*, 560 F.2d 547, 551 (2d Cir. 1977).

Teledyne's more significant objection to Teradyne's and the master's application of the *Jericho* formula in the case at bar is that neither of them made deductions on account of the wages paid to testers, shippers, installers, and other Teradyne employees who directly handled the T–347A, or on account of the fringe benefits amounting in the case of those and other employees to 12 per cent of wages. Teradyne gave as the reason for the omission of the wages of the testers, etc. that those wages would not have been affected if each of the testers, etc. handled one product more or less. However, the work of those employees entered as directly into producing and supplying the T–347A as did the work of a fabricator of a T–347A. Surely no one would regard as "reasonable overhead" within § 2–708(2) the wages of a fabricator of a T–347A even if his wages were the same whether he made one product more or less. We conclude that the wages of the testers, etc. likewise are not part of overhead and as a "direct cost" should have been deducted from the contract price. *A fortiori* fringe benefits amounting to 12 per cent of wages should also have been deducted as direct costs. Taken together we cannot view these omitted items as what *Jericho* called "relatively insignificant items." We, therefore, must vacate the district court's judgment. In accordance with the procedure followed in *Publicker Industries, Inc. v. Roman Ceramics Corp.*, 603 F.2d 1065, 1072–3 (3rd Cir. 1979) and *Famous Knitwear Corp. v. Drug Fair, Inc.*, 493 F.2d 251, 255–256 (4th Cir. 1974), we remand this case so that with respect to the omitted direct labor costs specified above the parties may offer further evidence and the court may make findings "with whatever definiteness and accuracy the facts permit, but no more." *Jericho*, p. 872, 286 N.E.2d 343.

There are two other matters which may properly be dealt with before the case is remanded to the district court.

3. Teledyne contends that Teradyne was required to mitigate damages by acceptance of Teledyne's offer to purchase instead of the T–347A the FET system.

That point is without merit.

The meaning of Teledyne's offer was that if Teradyne would forego its profit-loss claim arising out of Teledyne's breach of the T–347A contract, Teledyne would purchase another type of machine which it was under no obligation to buy. The seller's failure to accept such an offer does not preclude it from recovering the full damages to which it would otherwise be entitled. As Restatement (Second) Contracts, § 350 Comment c indicates, there is no right to so-called mitigation of damages where the offer of a substitute contract "is conditioned on surrender by the injured party of his claim for breach." "One is not required to mitigate his losses by accepting an arrangement with the repudiator if that is made conditional on his surrender of his rights under the repudiated contract." 5 Corbin, Contracts 2nd (1964) § 1043 at 274. Acc. *Campfield v. Sauer*, 189 F. 576 (6th Cir. 1911); *Stanspec Corp. v. Jelco, Inc.*, 464 F.2d 1184, 1187 (10th Cir. 1972). Teradyne acted in a commercially reasonable manner in refusing to accept Teledyne's offer.

4. Teradyne's appeal from the second part of the district court's judgment is on the ground that it was an abuse of discretion for the district court without equitable cause not to impose on Teledyne all the master's costs and to leave Teradyne, the prevailing party, with the burden of half of those costs.

We hold that the district court's order, made at the time the case was referred to the master, which provided for an equal payment of costs, was merely a temporary method of financing the master. The court retained its power at the end of the case to determine who should ultimately bear the master's costs.

Generally it is an abuse of discretion for a district court without cause to charge the prevailing party the costs of the reference to a master. *See Popeil Brothers, Inc. v. Schick Electric, Inc.*, 516 F.2d 772, 774 (7th Cir. 1975); *Chemical Bank & Trust Co. v. Prudence-Bonds Corp.*, 207 F.2d 67, 77–78 (2nd Cir. 1953).

As the matter stood when the district judge denied Teradyne's motion to require Teledyne to pay all the master's costs, while Teradyne had not prevailed on all the issues presented in its complaint which sought a recovery of $98,400, it had recovered $75,-392 by prevailing on all the issues finally submitted to the master. However, as a result of the present opinion that $75,392 recovery will be reduced by an unpredictable amount. Under these circumstances, we deem it appropriate to vacate the part of the judgment denying Teradyne's motion, and we remand the case to allow the district court after it has decided how much to deduct from the $75,392 recovery to determine afresh how the master's costs should be allocated. In making its determination the district court may exercise a reasonable discretion. It is not required to impose all the master's costs on Teledyne on the theory that since Teradyne recovered a substantial part of what it sought, it was the prevailing party. If it so chooses, the district court may adopt some other approach—for example, an allocation of the master's costs by reference to the ratio of the amount which Teradyne finally recovers to the amount it originally sought in the complaint or to the amount it sought when the case was submitted to the master.

*The district court's judgment is vacated and the case is remanded to the district court to proceed in accordance with this opinion.*