[No. A022608. First Dist., Div. Three. Jan. 15, 1985.]

NATIONAL CONTROLS, INC., Plaintiff and Respondent, v.
COMMODORE BUSINESS MACHINES, INC.,
Defendant and Appellant.

COUNSEL

Michael J. Korda and Clark & Korda for Defendant and Appellant.

Anderson, McDonald, Belden & Kelly, Richard W. Abbey and Roger J. Illsley for Plaintiff and Respondent.

OPINION

SCOTT, J.—Respondent National Controls, Inc. (NCI) brought an action for breach of contract against appellant Commodore Business Machines, Inc. (Commodore). After a court trial, judgment was entered awarding NCI over $280,000 in damages, and Commodore has appealed.

I

NCI manufactures electronic weighing and measuring devices. Among its products is the model 3221 electronic microprocessor technology load cell scale (the 3221), which is designed to interface with a cash register for use at checkout stands. NCI sells the 3221 to cash register manufacturers, also termed original equipment manufacturers, or O.E.M.'s. NCI does not main-

tain an inventory stock of the scales, but builds them to specific order by an O.E.M. The 3221 is a standard unit, which is modified by NCI to meet the specifications of each O.E.M. with respect to cash register compatibility, paint, and logo.

In November 1980, Commodore had initial discussions with NCI about the possibility of Commodore becoming an O.E.M. customer. By telephone, Commodore purchased one 3221, which was sent by NCI to Commodore's Texas facility, along with NCI's standard specifications for the 3221 and its standard price schedule. In December 1980, Commodore ordered and paid for four more scales. Again, the orders were made by telephone. NCI did not receive a purchase order from Commodore; instead, Commodore merely gave NCI a Commodore purchase order number over the phone; that number was written on the sales order prepared by NCI and sent to Commodore.

In March 1981, Terry Rogers of Commodore ordered an additional 30 scales. The order was placed by telephone, and once again Commodore did not send NCI a purchase order. Instead, Rogers gave Wiggins of NCI a purchase order number by telephone; that number was entered by Wiggins on NCI's sales order.

On March 31, 1981, in a phone conversation with Wiggins, Rogers placed a firm order for 900 scales: 50 to be delivered in May, 150 in June, 300 in July, and 400 in August. Wiggins and Rogers agreed on quantity, price, and delivery schedule. As in the previous transactions, Rogers gave Wiggins a purchase order number over the telephone, Wiggins then prepared an NCI sales order, entered on it the Commodore purchase order number, and mailed a copy of that sales order to Commodore. NCI also sent a copy of its sales order to its Florida manufacturing facility, which began manufacture of the units.

In a departure from its previous practice, Commodore also mailed its purchase order to NCI. Paragraph 19 of the reverse side of that order contained a provision limiting the damages for which Commodore would be responsible in the event of a breach; in particular, the provision disclaimed liability for any incidental or consequential damages.

Wiggins of NCI testified that he does not recall ever seeing the Commodore purchase order. Both he and Rogers testified that during their phone conversations, there was no discussion of any terms and conditions on that purchase order other than price, quantity, and delivery schedule. According to Commodore's Rogers, the primary purpose of its purchase order was to

confirm what had been discussed by telephone and to provide a written copy of the delivery schedule.

Delivery was made to Commodore of the first 200 units, and 300 units were ready to ship in June of 1981. As of that date, the remaining 400 units of the order were nearly complete. However, Commodore accepted only the first 50 scales, and did not accept or pay for the remaining 850 units. Thereafter, all of the 850 units were resold to National Semiconductor, an existing O.E.M. customer. NCI's vice president and general manager in charge of its Florida manufacturing facility testified that in 1980 and 1981, the plant had the production capacity to more than double its output of 3221's.

Among its findings and conclusions, the trial court concluded that the terms of the parties' contract were those established during their telephone discussions prior to and on March 31, 1981, and in the November 1980 letter from NCI to Commodore enclosing a price schedule, as well as "the terms" of NCI's prior sales orders. It then concluded that the provision on limitation of damages in Commodore's purchase order was a proposal for an additional term which did not become part of the contract because it was a material alteration thereof. The court also found that NCI was a "lost volume seller" who was entitled to recover the loss of profit it would have made on the sale of the 850 units to Commodore, notwithstanding its subsequent resale of those units to another customer.

## II

First, Commodore contends that its purchase order was a prerequisite to the formation of a contract between the parties, and that its terms were therefore a part of that contract.

Although the parties appear to agree that the sales provisions of the California Uniform Commercial Code[1] apply in this case, they disagree about the application of section 2207 of that code to the facts at hand.

Section 2207 provides: "(1) A definite and seasonable expression of acceptance or a written confirmation which is sent within a reasonable time

---

[1] Unless otherwise indicated, all statutory citations refer to the California Uniform Commercial Code. (See *Goldie* v. *Bauchet Properties* (1975) 15 Cal.3d 307, 314-315 [124 Cal.Rptr. 161, 540 P.2d 1, 99 A.L.R.3d 794].) Section 2102 states that "this division applies to transactions in goods"; section 2105 defines "goods" as "all things (including specially manufactured goods) which are moveable at the time of identification to the contract for sale. . . ."

operates as an acceptance even though it states terms additional to or different from those offered or agreed upon, unless acceptance is expressly made conditional on assent to the additional or different terms.

"(2) The additional terms are to be construed as proposals for addition to the contract. Between merchants such terms become part of the contract unless:

"(a) The offer expressly limits acceptance to the terms of the offer;

"(b) They materially alter it; or

"(c) Notification of objection to them has already been given or is given within a reasonable time after notice of them is received.

"(3) Conduct by both parties which recognizes the existence of a contract is sufficient to establish a contract for sale although the writings of the parties do not otherwise establish a contract. In such case the terms of the particular contract consist of those terms on which the writings of the parties agree, together with any supplementary terms incorporated under any other provisions of this code."

Under section 2207, parties may conclude a contract even though, after reaching accord, the forms which they exchange to memorialize their agreement differ because each has drafted its form to its own advantage. (*Steiner* v. *Mobil Oil Corp.* (1977) 20 Cal.3d 90, 99 [141 Cal.Rptr. 157, 569 P.2d 751].) Section 2207 recognizes that among the methods whereby a seller and buyer can enter into a contract is an oral agreement followed by confirmatory memoranda embodying the terms agreed upon. (See *Leonard Pevar Co.* v. *Evans Products Co.* (D.Del. 1981) 524 F.Supp. 546, 550; § 2-207, U. Com. Code, com. 1.) If those memoranda add terms not discussed, these new terms are treated as proposals under subdivision (2) of section 2207, and will not become part of the agreement if they materially alter it. (See *Leonard Pevar Co., supra,* at pp. 550-551; § 2-207, U. Com. Code, coms. 2, 3.) In such a case, the provisions of the California Uniform Commercial Code will fill in the missing terms or gaps in the parties' contract. (*Steiner* v. *Mobil Oil Corp., supra,* 20 Cal.3d at p. 104; see *Leonard Pevar Co., supra,* at p. 551.)

Section 2204, subdivision (1), provides: "A contract for sale of goods may be made in any manner sufficient to show agreement, including conduct by both parties which recognizes the existence of such a contract." The parties' conduct, including their negotiating procedure, may indicate a

consummated process of offer and acceptance, and thus an intent to contract. (See *Steiner* v. *Mobil Oil Corp., supra,* 20 Cal.3d at p. 106, fn. 8.)

For example, in *Harlow & Jones, Inc.* v. *Advance Steel Co.* (E.D.Mich. 1976) 424 F.Supp. 770, buyer informed seller during several phone conversations of its interest in purchasing 1,000 tons of steel. Later, seller sent a sales form to buyer, and buyer sent a purchase order to seller. Eventually, a dispute arose over whether delivery was timely, and each party sought to establish that its form set the terms of the agreement. However, the court relied on Uniform Commercial Code section 2-204 and found that the conduct of the parties indicated that a common understanding had been reached by telephone, and that their forms were no more than confirmatory memoranda of their oral contract. (*Id.,* at pp. 773-775; see also *Flight Systems, Inc.* v. *Elgood-Mayo Corp.* (Colo.App. 1982) 660 P.2d 909, 911 [evidence supports trial court's implied finding that purchase order was a confirmation of an oral contract rather than part of contract; purchase order proposed material alterations to contract, and did not become a part thereof].)

■ In this case, Commodore insists that its purchase order was a prerequisite to consummation of the contract between itself and NCI. However, the evidence is otherwise. Commodore had been sent a price list and other information about the 3221 in November 1980. Both Wiggins of NCI and Rogers of Commodore agreed that during their March 31, 1981, phone conversation, Rogers placed a firm order for the purchase of 900 scales, at a specific price and for delivery on a certain schedule. Rogers did not tell Wiggins that Commodore required any additional documentation to complete the contract; rather, according to Rogers, the purchase order was sent primarily to confirm what had been discussed over the telephone. During that conversation, there was no discussion of terms other than price, quantity, and delivery date. There was never any discussion between NCI and Commodore about provisions on Commodore's purchase order limiting damages. As with the previous orders, Commodore gave NCI a purchase order number by telephone, which NCI entered on its sales form. Thereafter, Commodore sent its purchase order to NCI. That evidence unquestionably establishes that the parties had reached agreement and entered into a contract of sale before the purchase order was sent, and that the order was a "formal memoranda embodying the terms so far as agreed upon and adding terms not discussed." (§ 2-207, U. Com. Code, com. 1.)

*Lockheed Electronics Co.* v. *Keronix, Inc.* (1981) 114 Cal.App.3d 304 [170 Cal.Rptr. 591], upon which appellant relies to argue that its purchase order was necessarily a part of the contract, is readily distinguishable. In that case, buyer made an offer by means of a purchase order which expressly

limited acceptance to its terms, and provided that any additional terms proposed by seller would be rejected unless expressly assented to in writing by buyer. Under those facts, the additional terms proposed by seller were not part of the contract. (*Id.*, at pp. 309-311.) Unlike the instant case, there was no oral agreement in *Lockheed.*

Nor is *American Parts Co., Inc.* v. *American Arbitration Ass'n.* (1967) 8 Mich.App. 156 [154 N.W.2d 5] of any help to Commodore. In that case, the court held that whether the parties had entered into a firm oral contract later confirmed in writing was a question of fact which could not be resolved on the basis of affidavits submitted in support of summary judgment; contrary to Commodore's assertion, the case does not support the conclusion that the purchase order was part of the contract in this case. (*Id.*, at p. 13.)

■ Under section 2207, subdivision (2)(b), Commodore's limitation on damages provision did not become part of its agreement with NCI if it "materially alter[ed]" the terms of that agreement. (*Steiner* v. *Mobil Oil Corp., supra,* 20 Cal.3d at pp. 101-102.) A new term is "material" within the meaning of this section if it would result in surprise or hardship if incorporated without express awareness by the other party. (*Id.*, at p. 102; see generally Annot., Sales—Terms Altering Contract (1976) 72 A.L.R.3d 479.) ■ Commodore's only argument with respect to the materiality of paragraph 19 is that it made no material change because it was part of the underlying agreement; Commodore does *not* go on to argue that even if there was an oral agreement, the limitations on damages provision did not materially alter that agreement. Accordingly, we conclude that Commodore has waived any such argument. (See *Henderson* v. *Security Nat. Bank* (1977) 72 Cal.App.3d 764, 769 [140 Cal.Rptr. 388], and cases cited therein.)[2]

In light of our conclusion, we need not consider NCI's contention that paragraph 19 did not become part of the contract because it conflicted with

---

[2]We note that in *Air Products & Chem., Inc.* v. *Fairbanks Morse, Inc.* (1973) 58 Wis.2d 193 [206 N.W.2d 414, 78 A.L.R.3d 619], the court held that a disclaimer of damages for consequential loss was material within the meaning of Uniform Commercial Code section 2-207. Air Products brought an action for breach of contract against Fairbanks, alleging that some large motors which it purchased failed to perform satisfactorily. As an affirmative defense, Fairbanks relied on a provision in its "acknowledgement of order" form purporting to limit its liability for consequential damages. The court construed that form as a proposal for additional terms to the contract, which included not only its express terms but also those implied by law. Relying on Uniform Commercial Code sections 2-714 and 2-715 which authorize consequential damages for a seller, the court concluded under the facts of the case, a term providing potential recovery for consequential loss was implicit in the contract. Accordingly, the disclaimer which had the effect of eliminating millions of dollars in damages was sufficiently material to require express conversation between the parties. (*Id.*, at pp. 420-425.)

a provision on NCI's sales order. (See § 2-207, U. Com. Code, com. 6.) Nor do we consider NCI's contention that if paragraph 19 was part of the contract, it could not be enforced because it was unconscionable under the circumstances.

## III

Commodore also contends that the trial court erred when it relied on section 2708, subdivision (2), to award NCI damages by way of lost profits. In a related argument, Commodore contends that if lost profits were the proper measure of damages, it was entitled under the plain language of section 2708 to credit for the proceeds of NCI's resale of the contract goods to National Semiconductor.

Damages caused by a buyer's breach or repudiation of a sales contract are usually measured by the difference between the resale price of the goods and the contract price, as provided by Uniform Commercial Code section 2-706. When it is not appropriate to use this difference to measure the seller's loss (as when the goods have not been resold in a commercially reasonable manner), the seller's measure of damages is the difference between the market and the contract prices as provided in Uniform Commercial Code section 2-708, subdivision (1). Ordinarily, this measure will result in recovery equal to the value of the seller's bargain. However, under certain circumstances this formula is also not an adequate means to ascertain that value, and the seller may recover his loss of expected profits on the contract under subdivision (2) of Uniform Commercial Code section 2-708. (3 Hawkland, Uniform Commercial Code Series (1982-1984) §§ 2-708–2-708:04.)

Section 2708 provides: "(1) Subject to subdivision (2) and to the provisions of this division with respect to proof of market price (Section 2723), the measure of damages for nonacceptance or repudiation by the buyer is the difference between the market price at the time and place for tender and the unpaid contract price together with any incidental damages provided in this division (Section 2710), but less expenses saved in consequence of the buyer's breach.

"(2) If the measure of damages provided in subdivision (1) is inadequate to put the seller in as good a position as performance would have done then the measure of damages is the profit (including reasonable overhead) which the seller would have made from full performance by the buyer, together with any incidental damages provided in this division (Section 2710), due

allowance for costs reasonably incurred and due credit for payments or proceeds of resale."

When buyers have repudiated a fixed price contract to purchase goods, several courts elsewhere have construed subdivision (2) of Uniform Commercial Code section 2-708 or its state counterpart to permit the award of lost profits under the contract to the seller who establishes that he is a "lost volume seller," i.e., one who proves that even though he resold the contract goods, that sale to the third party would have been made regardless of the buyer's breach.[3] (*Neri* v. *Retail Marine Corporation* (1972) 30 N.Y.2d 393 [334 N.Y.S.2d 165, 285 N.E.2d 311, 314]; *Snyder* v. *Herbert Greenbaum & Assoc., Inc.* (1977) 38 Md.App. 144 [380 A.2d 618, 624-625]; *Teradyne, Inc.* v. *Teledyne Industries, Inc.* (1st Cir. 1982) 676 F.2d 865, 866-868; *Nederlandse, etc.* v. *Grand Pre-Stressed Corp.* (E.D.N.Y. 1979) 466 F.Supp. 846, affd. 614 F.2d 1289.) The lost volume seller must establish that had the breaching buyer performed, the seller would have realized profits from two sales. (See Goetz & Scott, *Measuring Sellers' Damages: The Lost-Profits Puzzle* (1979) 31 Stan.L.Rev. 323, 326.)

In *Neri* v. *Retail Marine Corporation, supra,* 285 N.E.2d 311, seller contracted to sell a new boat, which it ordered and received from its supplier. The buyer then repudiated the contract. Later, seller sold the boat to another buyer, for the same price. The court relied on Uniform Commercial Code section 2-708, subdivision (2), to award the seller its lost profits under the contract, reasoning that the record established that market damages would be inadequate to put the seller in as good a position as performance would have done. The court drew an analogy to an auto dealer with an inexhaustible supply of cars. A breach of an agreement to buy a car at a standard price would cost that dealer a sale even though he was able to resell the car at the same price. In other words, had the breaching buyer performed, seller would have made two sales instead of one. (*Id.,* at pp. 312-315.)

While the seller in *Neri* was a retailer, the lost volume seller rule is also applicable to manufacturers. (*Nederlandse, etc.* v. *Grand Pre-Stressed Corp., supra,* 466 F.Supp. 846.) In *Nederlandse,* seller, a manufacturer of steel strand, brought an action against buyer for breach of an agreement to purchase approximately 1,180 metric tons of strand. Defendant had accepted only about 221 tons, and repudiated the remaining 958 tons, of which

---

[3]One California court has applied subdivision (2) of section 2708 to hold that a "middleman" is entitled to lost profits. (*Distribu-Dor, Inc.* v. *Karadanis* (1970) 11 Cal.App.3d 463, 470 [90 Cal.Rptr. 231].) That case is not dispositive here, as it does not involve a lost volume seller.

317 tons had been already produced by seller. Seller resold the 317 tons to various third party purchasers. (*Id.*, at p. 849.)

The court held that seller was entitled to lost profits under Uniform Commercial Code section 2-708, subdivision (2), and that no setoff would be allowed for profits earned through the sales to third parties. The evidence established that seller had sufficient production capacity to supply not only the 1,180 tons required by the contract, but also the 317 tons sold to third parties. The fact that seller was a manufacturer rather than a retailer, and that he produced only to order rather than maintaining an inventory, was of no significance in determining the applicability of Uniform Commercial Code section 2-708. (*Id.*, at pp. 853-854.)

Commodore accurately points out that the lost volume seller rule has been criticized by some commentators as overly simplistic. (Goetz & Scott, *supra*, 31 Stan.L.Rev. 323, 330-354.) Nevertheless, those courts considering the question have held that Uniform Commercial Code section 2-708 does allow lost profits to a "lost volume seller" and that criticism has not resulted in any revision of the section.

Commodore also contends that if NCI was entitled to lost profits under the contract, Commodore should have received credit for the proceeds of the resale.

■ The literal language of section 2708, subdivision (2), does provide some support for that contention: "If the measure of damages provided in subdivision (1) is inadequate to put the seller in as good a position as performance would have done then the measure of damages is the profit (including reasonable overhead) which the seller would have made from full performance by the buyer, *together with . . . due credit for payments or proceeds of resale.*" (Italics added.) However, courts elsewhere have uniformly held that the underscored language does not apply to a lost volume seller. (See *Neri* v. *Retail Marine Corporation, supra,* 285 N.E.2d at p. 314, fn. 2; *Famous Knitwear Corporation* v. *Drug Fair, Inc.* (4th Cir. 1974) 493 F.2d 251, 254, fn. 7; *Snyder* v. *Herbert Greenbaum & Assoc., Inc., supra,* 380 A.2d at pp. 625-626; *Teradyne, Inc.* v. *Teledyne Industries, Inc., supra,* 676 F.2d 865, 868.)

As the court in *Snyder* v. *Herbert Greenbaum & Assoc., Inc., supra,* 380 A.2d 618 explained, "Logically, lost volume status, which entitles the seller to the § 2-708(2) formula rather than the formula found in § 2-708(1), is inconsistent with a credit for the proceeds of resale. The whole concept of lost volume status is that the sale of the goods to the resale purchaser could

have been made with other goods had there been no breach. In essence, the original sale and the second sale are independent events, becoming related only after breach, as the original sale goods are applied to the second sale. To require a credit for the proceeds of resale is to deny the essential element that entitles the lost volume seller to § 2-708(2) in the first place—the mutual independence of the contract and the resale.

"Practically, if the 'due credit' clause is applied to the lost volume seller, his measure of damages is no different from his recovery under § 2-708(1). Under § 2-708(1) he recovers the contract/market differential and the profit he makes on resale. If the 'due credit' provision is applied, the seller recovers only the profit he makes on resale plus the difference between the resale price and the contract price, an almost identical measure to § 2-708(1). If the 'due credit' clause is applied to the lost volume seller, the damage measure of 'lost profits' is rendered nugatory, and he is not put in as good a position as if there had been performance." (*Id.*, at p. 625.)

In this case, the evidence was undisputed that in 1980 and 1981, NCI's manufacturing plant was operating at approximately 40 percent capacity. The production of the 900 units did not tax that capacity, and the plant could have more than doubled its output of 3221's and still have stayed within its capacity. That evidence was sufficient to support the court's findings that NCI had the capacity to supply both Commodore and National Semiconductor, and that had there been no breach by Commodore, NCI would have had the benefit of both the original contract and the resale contract. Accordingly, the trial court correctly determined that NCI was a lost volume seller, that the usual "contract price minus market price" rule set forth in subdivision (1) of section 2708 was inadequate to put NCI in as good a position as performance would have done, and that NCI was therefore entitled to its lost profits on the contract with Commodore, without any setoff for profits on the resale to National Semiconductor.

Judgment is affirmed.

White, P. J., and Barry-Deal, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied April 4, 1985. Lucas, J., was of the opinion that the petition should be granted.