BILL'S COAL COMPANY, INC., a corporation; William D. Patch; Savanna Lee Patch; Lloyd F. Burkdoll; Anna Faye Burkdoll; John E. Burkdoll; Virginia L. Burkdoll, and all the general partners of and d/b/a Cherokee Coal Company, a general partnership, Plaintiff–Appellants/Cross–Appellees,

v.

BOARD OF PUBLIC UTILITIES OF SPRINGFIELD, MISSOURI d/b/a City Utilities, and City of Springfield, Missouri, Defendants–Appellees/Cross–Appellants.

Nos. 87–1716, 87–1719.

United States Court of Appeals, Tenth Circuit.

Oct. 6, 1989.

George P. Coughlin (Paul Scott Kelly, Jr., with him on the briefs), of Gage & Tucker, Kansas City, Mo., for plaintiffs-appellants/cross-appellees.

Mark E. Gardner of Hall, Ansley, Carmichael & Gardner, Springfield, Mo. (Randell D. Wallace of Hall, Ansley, Carmichael & Gardner, Springfield, Mo., Stan P. Doyle of Doyle & Harris, Tulsa, Okl., and Turner White, III, Springfield, Mo., with him on the briefs), for defendants-appellees/cross-appellants.

Before McKAY, LOGAN, and TACHA, Circuit Judges.

McKAY, Circuit Judge.

This diversity case involves a contract dispute between the Board of Public Utilities of Springfield, Missouri d/b/a City Utilities and the City of Springfield, Missouri (collectively the "purchaser"), and Bill's Coal Company, Inc. and Cherokee Coal Co. (collectively the "sellers"). The long, tortured, procedural history of this case is recounted in our prior opinion, *Bill's Coal Co. v. Board of Public Utilities of Springfield*, 682 F.2d 883, 883–85 (10th Cir. 1982), *cert. denied*, 459 U.S. 1171, 103 S.Ct. 816, 74 L.Ed.2d 1014 (1983). A brief reprise of pertinent facts provides the setting for this appeal.

In 1970, Bill's Coal agreed to supply purchaser with its coal requirements on a cost-plus basis through 1980 and possibly beyond. The coal contract was assigned to Cherokee Coal in 1976, although Bill's Coal continued to operate the mines. In 1978 spot coal prices began to drop and the relationship between the parties deteriorated. After the parties were unable to resolve a dispute involving the administration of the contract's cost-plus features, purchaser filed suit against sellers, seeking a declaration as to the propriety of their disallowance of certain cost and expense items.

Ultimately, purchaser questioned the legality of the coal contract, withheld payments to sellers, and stopped taking deliveries of coal. However, sellers obtained a preliminary injunction requiring purchaser to perform the contract. Before a hearing on purchaser's motion to dissolve the injunction, the parties settled. The settlement was in the form of a final amendment to the contract, executed in 1979 (hereinafter the "1979 amendment"). The 1979 amendment shortened the contract from 1989 to 1985. In addition, the 1979 amendment created a termination clause in the contract. If any noncontract company was able to meet the contract specifications and submit a bid fifteen to twenty-five percent under sellers' price, purchaser could end the contract before 1985. Pursuant to this clause, purchaser attempted to terminate the contract in 1980, 1981, and 1982.

In March of 1980 purchaser sought a declaratory judgment of nonliability in the federal district court of Missouri with respect to its 1980 termination. Sellers filed suit in the federal district court of Oklahoma claiming purchaser breached and repudiated the contract in 1980 through wrongful termination. Sellers were granted a preliminary injunction by the Oklahoma court, requiring purchaser to perform the contract pending litigation. After the Oklahoma court issued the preliminary injunction, it transferred sellers' action to the Missouri court (where purchaser's action was pending). In December of 1980, the Missouri court transferred both cases

back to Oklahoma where they were consolidated for all purposes (the "1980 case"). The parties submitted the 1980 case to the Oklahoma court, without a jury, in three phases. Phase I involved the interpretation of the 1979 Amendment to the coal contract. Phase II involved breach and liability issues. Phase III involved damages.

In Phase II purchaser sought a declaration that it had properly terminated the contract by contracting with a qualified bidder in each of the years 1980, 1981, and 1982. Purchaser also sought to cancel the contract because of sellers' breach, repudiation, and "bad faith." The district court, in its Phase II ruling, held that sellers had breached and anticipatorily repudiated the contract. Based on that conclusion, injunctive relief in the 1980 case was dissolved. Sellers filed an immediate appeal to this court from the dissolution ruling. This court stayed the district court's order dissolving injunctive relief pending the appeal. *Bill's Coal Co.*, 682 F.2d 883. We found the district court erred in its conclusions of law in its Phase II opinion and ordered the injunction reinstated. *Id.* at 886. The case was remanded to determine sellers' damages. We expressed no view on the trial court's other rulings in Phase I or II.

On remand, the district court applied Missouri law to defeat an award of attorney's fees, applied Uniform Commercial Code (UCC) § 2–708(1) to measure damages by the difference between the contract price and the market price at the time and place of tender, and denied interest charges and other expenses to sellers under UCC § 2–710. The court also denied reimbursement for purchaser's BTU adjustments and for the mistake in overpayment of depreciation credit.

Sellers now appeal the district court's refusal to apply the lost profit damage measure of section 2–708(2), the district court's application of Missouri law to defeat an award of attorney's fees, and the court's denial of interest charges and other expenses under UCC § 2–710. Sellers also appeal the district court's denial of reimbursement for purchaser's BTU adjust-ments and for the mistaken overpayment of depreciation credit. Purchaser cross-appeals, claiming error in the district court's determination of the market price for coal on sellers' spot purchases. They also claim error in the court's failure to find that sellers breached and repudiated the contract through bad faith performance and enforcement and through shipments of noncompliance coal. Finally, purchaser appeals the district court's grant of summary judgment against them on their antitrust claim. We deal with each of these issues in turn.

## I. Standard of Review

Sellers and purchaser challenge the trial court's findings of fact and of law. We do not disturb the district court's findings of fact unless they are "clearly erroneous." Fed.R.Civ.P. 52(a); *United States v. United States Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948); *Amoco Production Co. v. Western Slope Gas Co.*, 754 F.2d 303, 309 (10th Cir.1985). A finding of fact will not be reversed as clearly erroneous unless "it is without factual support in record, or if the appellate court, after reviewing all the evidence, is left with the definite and firm conviction that a mistake has been made." *LeMaire v. United States*, 826 F.2d 949, 953 (10th Cir.1987). The district court need not be "correct" in its finding, but its conclusion must be "permissible" in light of the evidence. *Volis v. Puritan Life Ins. Co.*, 548 F.2d 895, 901 (10th Cir.1977).

We review issues of law, decided by the district court, de novo. *In re Ruti–Sweetwater, Inc.*, 836 F.2d 1263, 1266 (10th Cir. 1988). The standard of review on appeal is the same as that which would be applied by the trial court in making its initial ruling. *United States v. Ortiz*, 804 F.2d 1161, 1164 (10th Cir.1986). An appellate court is not constrained by a trial court's conclusions of law. *State Distrib., Inc. v. Glenmore Distilleries*, 738 F.2d 405, 412 (10th Cir.1984).

## II. Lost Profit Damage Measure

■ The district court determined that

UCC § 2–708(1)[1] applied in determining the proper measure of damages. The damages provided in section 2–708(1) are the difference between the market price and the contract price of the goods. UCC § 2–708(2) provides for damages up to the amount of the lost profits from the contract which has been breached. Sellers fall into section 2–708(2) only if they can demonstrate that they would receive inadequate damages under section 2–708(1). Section 2–708(2) is basically designed for specific categories of sellers, such as lost volume sellers, component sellers, and jobber sellers. *See* J. White and R. Summers, *Uniform Commercial Code*, 3d ed. (1988) at 356–65, for a full exposition on sellers that come under section 2–708(2). Sellers here argued that they were entitled to receive section 2–708(2) damages. Sellers have the burden of proving that they are lost volume sellers and thus fall under section 2–708(2). *Snyder v. Herbert Greenbaum & Associates, Inc.*, 38 Md.App. 144, 380 A.2d 618 (1977); *National Controls, Inc. v. Commodore Business Machines, Inc.*, 163 Cal.App.3d 688, 209 Cal.Rptr. 636 (1st Dist.App.1985); and *Lake Erie Boat Sales, Inc. v. Johnson*, 11 Ohio App.3d 55, 463 N.E.2d 70 (1983). A lost volume seller is one who has the capacity to perform the contract which was breached as well as other potential contracts, due to their unlimited resources or production capacity. Although sellers seek to portray the analysis of lost volume seller as a question of law subject to de novo review (sellers characterize their appeal as being limited to "questions of law"), it is a decision dictated by the underlying facts and thus ultimately a question of fact reviewed under the clearly erroneous standard.[2] Even where there is a mixed question of law and fact that involves primarily a factual inquiry, the "clearly erroneous" standard is appropriate. *Supre v. Ricketts*, 792 F.2d 958, 961 (10th Cir.1986).

Evidence presented at trial indicated that sellers did not have the production capacity to perform purchaser's contract as well as to sell to other potential purchasers. During the years following 1980, sellers often fell behind in shipping to purchaser the amount of coal required under the contract. In fact, one of the two principal mines on which sellers relied for shipments to purchaser was out of production for several months during this period. In order to meet purchaser's needs, sellers found it necessary to purchase coal from other suppliers. In addition, sellers claimed in the district court that they had lost sales to other customers because it was necessary to ship coal to purchaser from the Porter and Chetopa mines. This contention is in direct conflict with sellers' position that it had the capacity to perform the contract in dispute and also to sell to third parties. Mr. Hirlinger, sellers' president, admitted that sellers were able to make the sale of 11,609 tons of coal to another customer only because purchaser ceased accepting coal from sellers. Based on this evidence, the trial court found that the sellers did not have the ability to perform the contract in dispute and sell to potential third parties at the same time. Based on our review of the evidence, the district court was not clearly erroneous in its finding that sellers were not lost volume sellers, and thus section

1. U.C.C. § 2–708(1). Seller's Damages for Nonacceptance or Repudiation

(1) Subject to subsection (2) and to the provisions of this Article with respect to proof of market price (Section 2–723), the measure of damages for nonacceptance or repudiation by the buyer is the difference between the market price at the time and place for tender and the unpaid contract price together with any incidental damages provided in this Article (Section 2–710), but less expenses saved in consequence of the buyer's breach.

(2) If the measure of damages provided in subsection (1) is inadequate to put the seller in as good a position as performance would have done then the measure of damages is the profit (including reasonable overhead) which the seller would have made from full performance by the buyer, together with any incidental damages provided in this Article (Section 2–710), due allowance for costs reasonably incurred and due credit for payments or proceeds of resale.

2. The district court's finding was based to a large extent on the credibility of sellers' witnesses. A reversal would require this court to "second guess" the district court's evaluation of the credibility of those witnesses and the weight to be given to their testimony.

2–708(1) was the proper measure of damages.

### III. Attorney's Fees

█ Sellers contend that the Oklahoma district court, sitting in diversity, erroneously applied Missouri law on the issue of attorney's fees. They argue that the trial court should have applied Oklahoma's attorney fee statute because attorney's fees are purely procedural and the law of the forum (Oklahoma) governs.[3] However, the law in this circuit governing attorney's fees is clear. *In Matter of King Resources Co.,* 651 F.2d 1349, 1353 (10th Cir.1981), we held that "[t]hus in diversity cases generally, and certainly in this circuit, attorney fees are determined by state law and are substantive for diversity purposes." The substantive law of this case is Missouri law.[4] Therefore, the trial court properly applied Missouri law in determining whether attorney's fees were proper. We affirm the trial court's denial of attorney fees under Missouri law.

### IV. Interest and Other Expenses

█ Sellers argue they were entitled to recover interest expenses under UCC § 2–710.[5] They argue that the district court erred in interpreting "Missouri law" by holding that these charges did not qualify as incidental damages under section 2–710. The district court held that in this case the expenses claimed by sellers were not properly recoverable under section 2–710. We agree. Incidental damages include commercially reasonable expenses incurred in stopping delivery in the transportation, care, and custody of goods after the buyer's breach. The purpose of section 2–710 is to reimburse the seller for expenses reasonably incurred as a result of the buyer's breach. Here, the sellers' interest expenses were incurred as the result of preparing for this litigation. The trial court did not err in finding litigation costs and accounting fees not recoverable under section 2–710. Such expenses are not incidental damages under section 2–710.

█ The sellers alternatively argue that they are entitled to the recovery of pre-judgment interest under Oklahoma law. However, Missouri law governs the issue of remedies, and the Supreme Court of Missouri has held that the prevailing party may recover pre-judgment interest only in certain circumstances. *Denton Constr. Co. v. Missouri State Highway Comm'n,* 454 S.W.2d 44 (Mo.1970). Before prejudgment interest can be awarded, the claim must be liquidated or readily ascertainable by reference to recognized standards. The sellers' claim here has not been liquidated. In addition, the claim is not readily ascertainable. The sellers provided the trial court with several different calculations of damages. Purchaser contested all of sellers' calculations and provided alternative measures. Neither party had agreed to a specific dollar value of damages. Thus, the claim is not readily ascertainable by reference to a recognized standard. Therefore, we hold that the district court properly determined that sellers were not entitled to interest.

### V. BTU Adjustments

█ Sellers argue that BTU adjustments should not have been allowed purchaser, based on sellers' test results which demonstrated that purchaser was not entitled to the adjustments. The parties here agreed

---

**3.** Sellers rely on *Toland v. Technicolor, Inc.,* 467 F.2d 1045 (10th Cir.1972), for the proposition that Oklahoma law applies. In *Toland,* a diversity case, we applied the Oklahoma attorney fee statute; however, we did so in light of the fact that the alleged oral contract involved in the case was negotiated by telephone by parties in both Oklahoma and California. Thus, Oklahoma had the same number of contacts to the alleged contract as California. In addition, we concluded that no contract in fact existed. Thus, the law of the forum governed the award of attorney's fees.

**4.** The parties agreed that Missouri law governed substantive issues.

**5.** U.C.C. § 2–710. Seller's Incidental Damages

Incidental damages to an aggrieved seller include any commercially reasonable charges, expenses or commissions incurred in stopping delivery, in the transportation, care and custody of goods after the buyer's breach, in connection with return or resale of the goods or otherwise resulting from the breach.

that there would be an adjustment for all shipments of coal which fell below 11,000 BTU. The parties then entered into a course of performance with respect to the BTU adjustments which allowed the purchaser to make adjustments based on its own test results. The district court refused to second-guess that course of performance. Sellers had the burden of persuading the district court that they were entitled to a refund. Given the course of performance, we cannot find the district court clearly erroneous in refusing to grant sellers reimbursement for purchaser's BTU adjustments.

## VI. Purchaser's Cross–Appeal

■ Purchaser, in its cross-appeal, claims error in the district court's failure to find that the sellers breached and repudiated the contract through bad faith performance. Purchaser also claims that the district court erred in failing to find breach and repudiation by the sellers through their shipments of allegedly noncompliance coal. We do not find these factual conclusions of the district court to be clearly erroneous.

During the liability phase (Phase II) of this litigation, purchaser presented two theories to the trial court on the sellers' liability. The first theory was that the sellers had breached and anticipatorily repudiated the coal contract in 1979, by asserting an overly literal contract interpretation that it knew did not reflect the parties' intent. This was purchaser's "bad-faith" breach theory. The other theory advanced by purchaser was that sellers had breached and repudiated the coal contract by shipping deficient coal.

This court has already held that an assumed bad-faith assertion "of a particular interpretation of a termination clause is neither a failure to perform contract obligations (breach) nor an indication that those obligations will not be performed in the future (repudiation)." *Bill's Coal*, 682 F.2d at 886. The sellers did not interfere with the performance of either party under the coal contract, and purchaser gained no right to cancel or otherwise refuse performance of the coal contract. *Id.* at 885. This holding disposes of purchaser's first breach theory.

Purchaser now argues that this court left open the possibility that, after remand, purchaser could present evidence which would show that additional sellers' conduct amounted to a breach. Purchaser now argues that sellers breached the coal contract based on the "totality of the circumstances." Purchaser's basic argument is that sellers shipped nonconforming coal to purchaser on various occasions and that these shipments constituted a "substantial impairment" of the contract which resulted in either a general breach, a breach of warranty or a repudiation of the coal contract.

The case law indicates that the question of "substantial impairment" under the Code presents a question of fact. *Cherwell–Ralli, Inc. v. Rytman Grain Co., Inc.*, 180 Conn. 714, 433 A.2d 984, 986 (1980); *Holiday Mfg. Co. v. B.A.S.F. Systems, Inc.*, 380 F.Supp. 1096, 1102 (D.Neb. 1974); *Stinnes Interoil, Inc. v. Apex Oil Co.*, 604 F.Supp. 978, 981 (S.D.N.Y.1985). Purchaser frames the coal quality issue in terms of whether some of the sellers' shipments of nonconforming coal constituted a repudiation of the whole contract under UCC § 2–610. However, because the coal contract is an installment contract, the question of breach or repudiation falls within the confines of section 2–612.[6] Moreover, the Official Comments to section

---

6. U.C.C. § 2–612. "Installment Contract"; Breach

(1) An "installment contract" is one which requires or authorizes the delivery of goods in separate lots to be separately accepted, even though the contract contains a clause "each delivery is a separate contract" or its equivalent.

(2) The buyer may reject any installment which is non-conforming if the non-conformity substantially impairs the value of that installment and cannot be cured or if the non-conformity is a defect in the required documents; but if the non-conformity does not fall within subsection (3) and the seller gives adequate assurance of its cure the buyer must accept that installment.

(3) Whenever non-conformity or default with respect to one or more installments substantially impairs the value of the whole contract there is a breach of the whole. But the aggrieved party reinstates the contract if he

2-610 emphasize that issues of nonconformity to contract specifications are handled in the Code section dealing with installment contracts. UCC § 2–610, Official Comment 1. The issue, as properly stated under section 2–612(3), is whether a "nonconformity or default with respect to one or more installments substantially impairs the value of the whole contract" so as to constitute a breach of the whole contract. The Official Comments to section 2–612(3) expressly state that this subsection "is designed to further the continuance of the contract" and that "[w]hether the non-conformity in any given installment justifies cancellation as to the future depends, not on whether such non-conformity indicates an intent or likelihood that the future deliveries will also be defective, but whether the non-conformity substantially impairs the value of the whole contract." UCC § 2–612, Official Comment 6. In Phase II, the district court found that "[s]ellers tried to meet the contract specifications on every load of coal shipped to Purchaser and never knowingly shipped deficient coal." It further found that sellers' occasional failure to meet the contract specifications "did not rise to the level of substantially impairing the value of the contract." The district court then concluded that sellers had not breached or repudiated the coal contract, nor had sellers breached any warranties that might be applicable to the contract.

Purchaser has failed to show that the district court was clearly erroneous in finding that there was no substantial impairment of the value of the coal contract. Purchaser presented no new evidence to the district court after remand that would necessitate a finding of breach on the part of sellers. Accordingly, the district court's ruling on the coal quality issues must be affirmed. *See, e.g., Automated Controls, Inc. v. MIC Enterprises, Inc.,* 599 F.2d 288, 289 (8th Cir.1979).

### VII. Antitrust Claim

■ Sellers filed a motion for summary judgment with respect to purchaser's antitrust claim. The district court correctly held that the principle of res judicata

barred purchaser's attempt to try the claim now because "based on the stipulation of the parties ... the Missouri Court was to determine all the mutual liabilities of the parties and all issues which arose or could have been brought prior to the date of the order." District Court Order, at 6.

Purchaser could have raised its antitrust claim at the time the district court reviewed the enforceability and validity of the 1979 amendment. An examination of the antitrust claim shows that purchaser attacks the twenty-five percent termination clause as being unduly restrictive of competition among coal suppliers. The purpose of the clause and the mutual benefit of long-term coal contracts were referenced and discussed by the district court in its opinion. Nothing that occurred subsequent to the rendition of that judgment changed the fact that purchaser was required to secure a price twenty-five percent lower than sellers' price in order to take sellers out of the coal contract. Purchaser had a full opportunity to litigate its antitrust claim in the earlier case. Therefore, we affirm the district court's grant of summary judgment in favor of sellers.

### VIII. Overpayment of Depreciation Credit

Purchaser, in its brief, states that it does not dispute sellers' claim for the overpayment of depreciation credit. The sellers' requested adjustment of $4,592.00 was apparently overlooked by the district court. We therefore remand with directions for the district court to adjust its judgment by $4,592.00 and enter an appropriate order for payment of the depreciation credit.

AFFIRMED as to all but the overpayment of the depreciation credit. REMANDED to make the necessary adjustment.

accepts a non-conforming installment without seasonably notifying of cancellation or if he brings an action with respect only to past

installments or demands performance as to future installments.