**SCHIAVI MOBILE HOMES, INC.**

v.

**Frank E. GIRONDA, Jr., et al.**

Supreme Judicial Court of Maine.

Argued March 8, 1983.
Decided July 29, 1983.

Jeffrey P. Kilgore (orally), South Paris, for plaintiff.

Cloutier, Joyce, Dumas & David, Paul R. Dumas, Jr. (orally), Preti, Flaherty & Beliveau, Albert J. Beliveau, Rumford, for defendants.

Before McKUSICK, C.J., GODFREY, NICHOLS, CARTER * and WATHEN, JJ., and DUFRESNE, A.R.J.

NICHOLS, Justice.

The principal issue in this appeal involves a retailer's duty to mitigate damages following a customer's breach of a contract for the purchase from the retailer of a mobile home.

On January 23, 1979, the Defendants, Frank Gironda, Jr., and Patricia Gironda, signed a contract with the Plaintiff, Schiavi Mobile Homes, Inc., for the purchase from that corporation of a yellow, two-bedroom mobile home for a total purchase price of $23,028.69. The Defendants paid a $1,000 deposit.

After undergoing difficulties—medical, financial and marital—the Defendants breached the purchase contract. In September 1979, Howard Palmer, an agent of Schiavi, contacted Frank Gironda, Sr., the father of Frank, Jr. Palmer asked if Frank, Jr., was still planning to purchase the mobile home. Frank Gironda, Sr., responded that because of his son's problems and his son's relocation to the West Coast, he did not know what he planned to do. Frank, Sr., then asked Palmer if he could purchase the home so his son would not lose his deposit. He expressed a willingness to mortgage his own home for this purpose. Palmer responded that this would not be necessary.

On November 7, 1979, the Plaintiff sold this mobile home to a third party for $22,-000, and then commenced this action in

* Carter, J. sat at oral argument and participated in the initial conference but resigned before this opinion was adopted.

Superior Court, Oxford County, seeking from the Defendants $4,800 in lost profits and interest expense allegedly incurred as a result of the Defendants' breach. Following a jury-waived trial, the Superior Court awarded the Plaintiff judgment in the amount of $759.45.[1] Thereupon the Plaintiff appealed, asserting that it was entitled to recover lost profits and greater incidental damages. The Defendants cross-appealed, contending first, that the sale contract was unconscionable and invalid, and second, that the Superior Court erred in awarding any damages in light of the Plaintiff's failure to mitigate. We deny the appeal and sustain the cross-appeal.

The determinative issue in this case concerns the retailer's alleged failure to mitigate damages. At trial only one witness, Frank Gironda, Sr., was called. The father testified as to his conversation with Palmer, in which he expressed his willingness to purchase the mobile home. Although admitting that he did not at that time have ready cash sufficient to cover the cost of the home, he testified that he owned a $30,000 house free and clear and had been ready to mortgage it for that purpose. Questioned by the court as to his willingness to purchase the mobile home in place of his son, the witness testified that he told Palmer that he was willing to buy the mobile home if his son could not be found. He said, "That's the way we operate in our family, Your Honor."

The Plaintiff presented no evidence on the issue of mitigation. After argument by counsel, the Superior Court ruled from the bench that the Plaintiff had not failed to properly mitigate damages, because the offer by the Defendant's father was conditional and vague.[2] In so ruling, the court misapplied the doctrine of mitigation.

It has long been the rule in this state that when a contract is breached, the nonbreaching party has an affirmative duty to take reasonable steps to mitigate his damages. As early as 1830 this Court declared that if a party "has it in his power to take measures, by which his loss may be less aggravated, this will be expected of him." *Miller v. Mariner's Church,* 7 Me. 51, 55 (1830). Similarly, in *Grindle v. Eastern Express Company* we stated that:

> [T]he law makes it incumbent upon a person for whose injury another is responsible, to use ordinary care and take all reasonable measures within his knowledge and power to avoid the loss and render the consequences as light as may be; and it will not permit him to recover for such losses as by such care and means might have been prevented.

67 Me. 317, 325 (1877).[3]

The common law duty to mitigate damages survives Maine's enactment of the Uniform Commercial Code in 1963. While the U.C.C. does not explicitly require the mitigation of damages, it does provide that "principles of law and equity" not displaced shall supplement the Code's provisions. 11 M.R.S.A. § 1–103 (1964). The duty to mitigate is also implicit in the Code's broad requirements of good faith, commercial rea-

---

1. This judgment reflected the retention by the Plaintiff of the $1,000 deposit. The Superior Court calculated damages by subtracting the resale price of the home ($22,000) from the contract price ($23,028.69) and then adding in incidental damages for floor-plan interest accruing from the breach ($731.45). We note that these figures yield a damage amount of $1,760.14, which after subtracting the deposit, should have resulted in a judgment of $760.14. The court also awarded the Plaintiff $500 in interest, costs and attorney's fees.

2. The court ruled:
   I'm going to find for Schiavi on this issue. It is conditional. Even if it weren't, I think this

is similar to purchase and sale where you have an actual intent before suing to recover damages. You can't do business on this kind of vague promises and understanding otherwise nobody would know where he stands.

3. *See also Isenman v. Burnell,* 125 Me. 57, 61, 130 A. 868, 870 (1925); *Crosby v. Plummer,* 111 Me. 355, 357, 89 A. 145, 146 (1913); *Sutherland v. Wyer,* 67 Me. 64, 69 (1877). *Cf. Michaud v. Steckino,* 390 A.2d 524, 531 (Me. 1978) ("There is a positive duty upon a person injured through the negligence of another to minimize his damages and to use reasonable diligence in securing medical or surgical aid.").

sonableness and fair dealing. *See American National Bank and Trust Company of Chicago v. Weyerhaeuser Company,* 692 F.2d 455, 468 (7th Cir.1982); 11 M.R.S.A. §§ 1–203, 2–103 (1964); *see also* 11 M.R.S.A. § 1–106, Comment 1 (1964) ("damages must be minimized").[4]

■ The touchstone of the duty to mitigate is reasonableness. The nonbreaching party need only take reasonable steps to minimize his losses; he is not required to unreasonably expose himself to risk, humiliation or expense.[5]

■ In the instant case the Superior Court never focused directly on the reasonableness of the Plaintiff's failure to pursue the offer of Frank Gironda, Sr., to purchase the mobile home in the place of his son. Instead the court solely concerned itself with the legal sufficiency of the father's offer. This approach was fraught with error.

First, the father's announced willingness to purchase the mobile home was conditioned only on his son not being found; that is, upon there being a breach of the son's contractual obligation. That was the same contingency from which arose the Plaintiff's duty to mitigate. As soon as that duty to mitigate arose, the Plaintiff had available to it a then unconditional willingness on the father's part to buy the mobile home.

Second, the father asked the Plaintiff if he could purchase the mobile home in place of his son, and at the time he was ready, willing and able to make the purchase. We cannot agree with the Superior Court's conclusion that the father's offer was too vague to have constituted the foundation for a binding contract when accepted by the Plaintiff.

In any event, the duty to mitigate is more than just a duty to accept legally enforceable offers. Upon learning of the Defendants' breach, the Plaintiff was obligated to take reasonable affirmative measures to keep its losses to a minimum. Palmer's conversation with Frank Gironda, Sr., in September, 1979, revealed that he had a party willing to pay the full price of the mobile home. Regardless of whether the father actually made a valid "offer," the retailer had a duty to pursue this opportunity to minimize the effects of the breach. Instead, the Plaintiff waited another two months and then sold the home for $1,028.-69 less than Frank Gironda, Sr., was willing to pay.

There is no evidence in the record that the Plaintiff's failure to sell to its customer's father rested on any legitimate ground. Because the Plaintiff did not take reasonable measures to mitigate its damages, we conclude that the Superior Court erred in awarding it damages based on the ultimate reduction in the selling price of the mobile home. This case must be returned to that court for a recomputation of damages.

Our conclusion that the Plaintiff did not properly mitigate its damages disposes of the Plaintiff's primary argument on appeal, that the Superior Court erred in not awarding it lost profits under 11 M.R.S.A. § 2–708(2) as a "lost-volume seller."[6] In order

---

**4.** *Cf. TCP Industries, Inc. v. Uniroyal, Inc.,* 661 F.2d 542, 550 (6th Cir.1981) (common law duty to mitigate applies in cases subject to Michigan U.C.C.). A thorough discussion of the duty to mitigate in cases governed by the Uniform Commercial Code may be found at 11 P.O.F.2d 131 (1976).

**5.** *See* 11 W. Jaeger, *Williston On Contracts* § 1353, at 274 (3d ed. 1968); J. Murray, *Grismore On Contracts* § 198, at 313–14 (rev. ed. 1965).

**6.** Stated generally, the concept of lost-volume sales posits that a seller of goods who conducts a resale following a breach will not be "made whole" if only allowed to recover the difference between the contract price and resale price when the resale is made to a second customer, at the expense of a second sale. The concept presupposes a situation in which supply outstrips demand and in which the second customer would have been successfully solicited by the seller had the original breach not occurred. Assuming these conditions, the seller is awarded lost profits as compensation for his "loss" of a sale to one customer.

Lost-volume recovery has been recognized in the following cases: *Teradyne, Inc. v. Teledyne*

to minimize its damages, the Plaintiff should have sold the mobile home to Frank Gironda, Sr. Had it done so there would have been no lost-volume potential inasmuch as it is clear from the record that the father was interested in purchasing the home *only* because his son was unable to do so. A sale to Frank Gironda, Sr., would not have occasioned any lost profits. *See* Sebert, *Remedies Under Article Two of the Uniform Commercial Code: An Agenda for Review,* 130 U.Pa.L.Rev. 360, 387–88 (1981).

Accordingly, because the Plaintiff failed to sell the home to Frank Gironda, Sr., it cannot now be heard to complain that its sale to a third party resulted in lost profits. We leave for another day the question of the validity of lost-volume recovery.

■ The Plaintiff also contends that the Superior Court erred in not awarding it "floor-plan interest"[7] for the entire period between the date of breach (April 20, 1979) and the date of resale (November 7, 1979). The court did award the Plaintiff floor-plan interest from April 20 to August 17, 1979, the date on which the Plaintiff paid off a loan which it had taken out to purchase the mobile home in question. The Plaintiff claims that it was entitled to floor-plan interest on the use of its own money tied up in the mobile home after the loan had been repaid; that is, from August 17 to November 7, 1979.

We note initially that the Plaintiff's failure to sell the home to Frank Gironda, Sr., in September bars recovery of any interest expense incurred after that point in time. Thus, the only relevant period is from the date the loan was repaid, August 17, to the date in September when the Plaintiff turned down the father's offer.

Several of the seller's remedies provided under the Uniform Commercial Code for breach of contract permit the recovery of incidental damages. *See* 11 M.R.S.A. §§ 2–706, 2–708, 2–709 (1964). The Code defines "seller's incidental damages" as follows:

> Incidental damages to an aggrieved seller include any commercially reasonable charges, expenses or commissions incurred in stopping delivery, in the trans-

Industries, Inc., 676 F.2d 865 (1st Cir.1982); *Famous Knitwear Corp. v. Drug Fair, Inc.,* 493 F.2d 251 (4th Cir.1974); *Capital Steel Co. v. Foster and Creighton Co.,* 574 S.W.2d 256 (Ark. 1978); *Distribu-Dor, Inc. v. Karadanis,* 11 Cal. App.3d 463, 90 Cal.Rptr. 231 (Cal.Ct.App. 1970); *Snyder v. Herbert Greenbaum and Associates, Inc.,* 38 Md.App. 144, 380 A.2d 618 (Md.Ct.Spec.App.1977); *Neri v. Retail Marine Corp.,* 30 N.Y.2d 393, 285 N.E.2d 311, 334 N.Y. S.2d 165 (1972).

Pertinent commentary includes: J. Calamari & J. Perillo, *The Law of Contracts* § 14–23 (2d ed. 1977); 5 *Corbin on Contracts* § 1100, at 541–42 (1964); W.·Hawkland, *Sales and Bulk Sales* 183–84 (3d ed. 1976); R. Nordstrom, *Handbook of the Law of Sales* § 177 (1970); *Restatement (Second) of Contracts* § 347 comment f & illustration 16, § 350 comment d § illustrations 9 & 10 (1981); Childres & Burgess, *Seller's Remedies: The Primacy of UCC 2–708(2),* 48 N.Y.U. L.Rev. 833, 880–86 (1973); Eisenberg, *The Bargain Principle and Its Limits,* 95 Harv.L.Rev. 741, 791–98 (1982); Goetz & Scott, *Measuring Sellers' Damages: The Lost-Profits Puzzle,* 31 Stan.L.Rev. 323 (1979); Harris, *A General Theory for Measuring Seller's Damages for Total Breach of Contract,* 60 Mich.L.Rev. 577 (1962); Harris, *A Radical Restatement of the Law of*

*Seller's Damages: Michigan Results Compared,* 61 Mich.L.Rev. 849 (1963); Harris, *A Radical Restatement of the Law of Seller's Damages: New York Results Compared,* 34 Fordham L.Rev. 23 (1965); Harris & Graham, *A Radical Restatement of the Law of Seller's Damages: California Results Compared,* 18 Stanford L.Rev. 553 (1965); Harris, *A Radical Restatement of the Law of Seller's Damages: Sales Act and Commercial Code Results Compared,* 18 Stan.L.Rev. 66 (1965); Sebert, *Remedies Under Article Two of the Uniform Commercial Code: An Agenda for Review,* 130 U.Pa.L.Rev. 360, 386–96 (1981); Schlosser, *Construing UCC Section 2–708(2) to Apply to the Lost-Volume Seller,* 24 Case W.Res.L.Rev. 686 (1973); Shanker, *The Case for a Literal Reading of UCC Section 2–708(2),* 24 Case W.Res.L.Rev. 697 (1973); Speidel and Clay, *Seller's Recovery of Overhead Under UCC Section 2–708(2): Economic Cost Theory and Contract Remedial Policy,* 57 Cornell L.Rev. 681 (1972); Comment, *A Theoretical Postscript: Microeconomics and the Lost-Volume Seller,* 24 Case W.Res.L.Rev. 712 (1973).

**7.** "Floor-plan interest" is the interest a retailer pays in borrowing money to purchase an item it plans to sell, the loan being secured by the item on the retailer's "floor."

portation, care and custody of goods after the buyer's breach, in connection with return or resale of the goods or otherwise resulting from the breach.

11 M.R.S.A. § 2–710.

While we would agree that floor-plan interest actually paid by a seller after a breach may constitute recoverable incidental damages, *see Bulk Oil (U.S.A.), Inc. v. Sun Oil Trading Company,* 697 F.2d 481, 483 (2d Cir.1983); *Neri v. Retail Marine Corp.,* 30 N.Y.2d 393, 401, 285 N.E.2d 311, 315, 334 N.Y.S.2d 165, 170 (1972), we cannot read the phrase "commercially reasonable charges, expenses or commissions" as including wholly hypothetical charges that a seller would assert as arising out of the use of his own funds to pay off a loan. The Official Comment to section 2–710 states that the section "intends to allow all commercially reasonable *expenditures* made by the seller." (Emphasis added). Interest a seller would purport to pay itself is not an expenditure.[8] Accordingly, in denying the Plaintiff floor-plan interest extending beyond the actual payment of such interest, the Superior Court committed no error.[9]

■ The final issue we need address is the Defendants' argument on cross-appeal that the purchase and sale agreement is invalid because it is unconscionable and constitutes a violation of the Unfair Trade Practices Act, 5 M.R.S.A. § 206 *et seq.* (1979). This argument is clearly born of hindsight, and it cannot be asserted for the first time on appeal. *Cannan v. Bob Chambers Ford,* 432 A.2d 387, 388–89 (Me.1981). No obvious error appearing from the record, we will not consider this issue.

The entry is:

Appeal denied.

Cross-appeal granted.

Judgment vacated.

**8.** Taken to its logical limits, the Plaintiff's theory would allow a seller to recover as incidental damages interest on the value of any goods later resold whether or not prior financing was involved. Section 2–710 does not go this far.

Remanded for further proceedings consistent with the opinion herein.

All concurring.

**9.** We note, furthermore, the absence in the record of any evidence that the *Plaintiff's* funds were used in repayment of the loan.