ISLAMIC REPUBLIC OF IRAN, Air Force of the Islamic Republic of Iran, Plaintiffs-Appellants,

v.

The BOEING COMPANY and Logistics Support Corporation, Defendants-Appellees.

No. 84–3542.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted June 25, 1985.

Decided Sept. 17, 1985.

As Amended Oct. 4, 1985.

David M. Balabanian, James L. Hunt, John R. Reese, Randall J. Litteneker, McCutchen, Doyle, Brown & Enersen, San Francisco, Cal., for plaintiffs-appellants.

John Dillow, Thomas J. MacLaughlin, Perkins, Coie, Stone, Olsen & Williams, Seattle, Wash., for defendants-appellees.

Before WALLACE, FARRIS, and HALL, Circuit Judges.

WALLACE, Circuit Judge:

The Islamic Republic of Iran (Iran) appeals an adverse judgment on counterclaims brought by the Boeing Company (Boeing) and Logistics Support Corporation (LSC). The district court had jurisdiction under 28 U.S.C. § 1332(a)(4). Since the order from which Iran appeals disposes of all remaining claims in this action, we have jurisdiction pursuant to 28 U.S.C. § 1291. We affirm in part, reverse in part, and remand with instructions.

I

On May 8, 1979, Iran filed complaints against Boeing and LSC for $75,000,000 in damages resulting from the crash of a Boeing 747 aircraft owned by Iran, alleging defects in the aircraft manufactured by Boeing and inadequate support services provided by LSC under the Operations Support Contract (contract). In its answer, LSC asserted a compulsory counterclaim. On June 2, 1980, the district court granted summary judgment in favor of Boeing and LSC on Iran's claims, but did not decide LSC's counterclaim. We initially dismissed Iran's appeal from the summary judgment because the compulsory counterclaim had not been decided; thus, a final judgment had not been reached. *Islamic Republic of Iran v. Boeing Co.*, No. 80–3255 (9th Cir. Mar. 5, 1981) (unpublished). Iran then obtained a certification pursuant to Fed.R. Civ.P. 54(b) and filed a new appeal. We affirmed the summary judgment. *Islamic Republic of Iran v. Boeing Co.*, 716 F.2d 910 (9th Cir.1983) (unpublished).

In January 1981, the United States and Iran reached an agreement on the release of the American hostages held in Iran. The settlement was contained in five separate agreements (the Accords), the first two of which established a framework for settling claims between the two nations, and claims in which a national of one party sued the other party. On February 24, 1981, President Reagan issued Exec. Order No. 12294, 3 C.F.R. 139 (1982) (Executive Order), which ratified President Carter's previous executive orders and his execution of the Accords. *Id.* at 140. The Treasury Department subsequently promulgated regulations in conjunction with the Executive Order to implement the Accords. *See* 31 C.F.R. pt. 535 (1984).

On April 20, 1981, Boeing and LSC moved to amend their answers to assert permissive counterclaims. The district court granted leave to amend. Iran, however, failed to answer Boeing's and LSC's requests for discovery. After the district court granted additional time to respond, Iran filed incomplete responses. The district court then entered a default judgment against Iran as a sanction, from which Iran does not appeal. The district court entered a final judgment in favor of Boeing and LSC on the counterclaims on November 1, 1983. Iran failed to file a timely notice of appeal and moved for an extension pursuant to rule 4(a)(5), Fed.R.App.P., within thirty days of the last day to file pursuant to rule 4(a). The district court granted the request, and Boeing appealed. We affirmed the extension. *Islamic Republic of Iran v. Boeing Co.*, 739 F.2d 464, 465 (9th Cir.1984) (per curiam), *cert. denied*, — U.S. —, 105 S.Ct. 1755, 84 L.Ed.2d 819 (1985). Thus, Iran's appeal is timely.

II

We first discuss Iran's liability on the permissive counterclaims. Most of Iran's

challenges focus on the interaction between the Accords and the Executive Order. We will address each of these arguments in turn.

The first issue is whether the district court had jurisdiction over the counterclaims. Iran argues that the Accords divested the district court of jurisdiction to interpret the Accords. This argument is based largely on the language of article VI, ¶ 4 of the Declaration of the Government of the Democratic and Popular Republic of Algeria Concerning the Settlement of Claims by the Government of the United States of America and the Government of the Islamic Republic of Iran (Claims Declaration), Jan. 19, 1981, United States-Iran, 20 I.L.M. 230, which provides that "[a]ny question concerning the interpretation or application of this agreement shall be decided by the [Iran-United States Claims] Tribunal upon the request of either Iran or the United States." Boeing and LSC, however, assert that the terms of the Accords are not self-executing because they were expressly contingent on statements of adherence, see Declaration of the Government of the Democratic and Popular Republic of Algeria ¶ 6 (General Declaration), Jan. 19, 1981, United States-Iran, 20 I.L.M. 224, and because the terms of the Accords anticipate further action. If the Accords are not self-executing, they are merely executory agreements between the two nations and have no effect on domestic law absent additional governmental action. Cf. Foster v. Neilson, 27 U.S. (2 Pet.) 253, 313–14, 7 L.Ed. 415 (1829) (Foster) (If the agreement terms "import a contract ... the legislature must execute the contract, before it can become a rule for the court"), overruled on other grounds, United States v. Percheman, 32 U.S. (7 Pet.) 51, 89, 8 L.Ed. 604 (1833).

■■■ There are at least four relevant factors to be considered when determining whether a treaty, and by analogy an executory agreement, is self-executing: (1) "the purposes of the treaty and the objectives of its creators," (2) "the existence of domestic procedures and institutions appropriate for direct implementation," (3) "the availability and feasibility of alternative enforcement methods," and (4) "the immediate and long-range social consequences of self- or non-self-execution." People of Saipan v. United States Department of Interior, 502 F.2d 90, 97 (9th Cir.1974), cert. denied, 420 U.S. 1003, 95 S.Ct. 1445, 43 L.Ed.2d 761 (1975) (Saipan). We conclude, however, that it is the first factor that is critical to determine whether an executive agreement is self-executing, while the other factors are most relevant to determine the extent to which the agreement is self-executing. Compare Foster, 27 U.S. (2 Pet.) at 314, 7 L.Ed. 415 ("when the terms of the stipulation import a contract ... the treaty addresses itself to the political, not the judicial department; and the legislature must execute the contract, before it can become a rule for the court") (emphasis added), with Saipan, 502 F.2d at 97 (these factors determine "[t]he extent" of self-execution, relying primarily upon the language and intent of the parties).

Both the language and intent of the Accords support a conclusion that they are not self-executing. The effectiveness of the Accords was contingent on the receipt of statements of adherence. General Declaration ¶ 6. The key provision of the Accords at issue in this case, the suspension of claims in American courts pending the Tribunal's decision, also is couched in executory language: "the United States agrees to terminate all legal proceedings in United States courts involving claims ... against Iran ..., [agrees] to nullify all attachments and judgments obtained therein, [agrees] to prohibit all further litigation based on such claims, and [agrees] to bring about the termination of such claims through binding arbitration." General Declaration ¶ B (emphasis added).

Iran, however, asserts that article VI, ¶ 4 of the Claims Declaration is self-executing because it states that questions of interpretation "shall be decided" by the Tribunal. While this mandatory language arguably supports Iran's position, it is insufficient. Our review of the history of the Accords

reveals that neither President of the United States intended to make the Accords self-executing. In his Statement of Adherence, President Carter did not make the Accords United States law, but only made them legally binding on the United States as a sovereign: "The two Declarations shall constitute international agreements legally binding upon the United States and Iran...." Statement of Adherence, 1980–81 Pub. Papers 3026 (Jan. 19, 1981). Similarly, President Reagan expressly stated that Executive Order No. 12294 was an *implementation* of the Accords, an unnecessary statement if the suspension covenant was self-executing:

> The circumstance necessitating the exercise of this authority [issuing Exec. Order No. 12294] is *the implementation of the Claims Settlement Agreement* between the United States and Iran. After a complete review of the agreements with Iran leading to the release of the hostages held by Iran *I have decided to implement them.*

Message to the Congress on the Suspension of Litigation Against Iran, 1981 Pub. Papers 159 (Feb. 24, 1981) (emphasis added).

██ We conclude that the language, purpose and intention behind the Accords was to make them executory agreements, and that they are not self-executing, either in whole or in part. This result is consistent with *Electronic Data Systems Corp. Iran v. Social Security Organization*, 651 F.2d 1007, 1009–10 & n. 1 (5th Cir.1981), in which the Fifth Circuit concluded, without analysis, that the relevant provisions of the Accords were not self-executing. Based on our analysis, therefore, we reject Iran's argument that the Accords divested the district court of jurisdiction over the counterclaims. *See, e.g., Itek Corp. v. First National Bank of Boston*, 730 F.2d 19, 23 (1st Cir.1984) (interpreting the Claims Declaration without discussing jurisdiction); *cf. Dames & Moore v. Regan*, 453 U.S. 654, 684–85, 101 S.Ct. 2972, 2989–90, 69 L.Ed.2d 918 (1981) (*Dames & Moore*) (concluding that Exec. Order 12294 did not divest the

federal court of jurisdiction over suspended claims).

There is lurking in this case an underlying constitutional question: can the President enter into executive agreements that have domestic effect without complying with article II, section 2, clause 2 of the Constitution? That question has been answered for us for purposes of this case in *Dames & Moore*, in which the Supreme Court specifically concluded that the President did not violate the Constitution by unilaterally entering into the Accords and issuing the Executive Order due to the "history of congressional acquiescence in conduct of the sort engaged in by the President." 453 U.S. at 678–79, 101 S.Ct. at 2986. However, we do not intend to suggest or imply that unilateral executive agreements, whether self-executing or not, can have domestic effect in all circumstances. *See Weinberger v. Rossi*, 456 U.S. 25, 30 n. 6, 102 S.Ct. 1510, 1514 n. 6, 71 L.Ed.2d 715 (1981) (unilateral executive agreements may "in appropriate circumstances have an effect similar to treaties in some areas of domestic law").

### III

The next issue is whether the Accords and Executive Order permit the assertion of permissive counterclaims against Iran in a suit it commenced prior to the hostage crisis. This issue has two aspects: (1) whether the Executive Order is consistent with the Accords, and if not, which of the two controls to determine the effect on domestic law, and (2) whether this case meets the requirements set out in the Executive Order.

### A.

Iran asserts that Executive Order No. 12294, by creating an exception for counterclaims, is directly contrary to the Accords, and that the Accords are controlling. The Executive Order provides that "[n]othing in this Order shall prohibit the assertion of a counterclaim ... by a United States national in any judicial proceeding pending or hereafter commenced by the

Government of Iran." Exec. Order No. 12294, § 6, 3 C.F.R. at 139, 140 (1982). Iran argues that this is inconsistent with the language of the Accords in which "the United States agrees to terminate all legal proceedings in the United States courts involving claims of United States persons and institutions against Iran." General Declaration ¶ B; *see also* 31 C.F.R. § 535.-222(b) (1984).

■ Because we conclude that section 6 of the Executive Order is consistent with the Accords, we need not decide which of the two is controlling for the purpose of determining domestic effect. The Accords do not purport to vest jurisdiction over all possible claims in the Tribunal, but only to grant jurisdiction over

> *claims* of nationals of the United States against Iran and *claims* of nationals of Iran against the United States, and any *counterclaim* which arises out of the same contract, transaction or occurrence that constitutes the subject matter *of that national's claim.*

Claims Declaration, art. II, ¶ 1 (emphasis added). The Claims Declaration distinguishes between "claims" and "counterclaims." This is significant because the language modifying the counterclaim clause indicates that the Accords vest the Tribunal with jurisdiction only over those counterclaims that are in response to a *national's* claim, i.e., the Tribunal has jurisdiction only over counterclaims brought by either Iran or the United States *against a national* of the other nation. In addition, the fact that the drafters distinguished between claims and counterclaims in this provision and mentioned only counterclaims brought by *the parties* suggests strongly that if they had wanted to include counterclaims asserted by nationals against the parties in pending or subsequent proceedings in the courts of the parties they would have done so. Thus, we conclude that section 6 of the Executive Order is consistent with this language because the Claims Declaration does not contemplate the assertion of the Tribunal's jurisdiction over the counterclaims of nationals against the parties.

Our reasoning that section 6 is consistent with the Accords is in harmony with other authority. Although no court has yet interpreted section 6 of the Executive Order, one court has interpreted section 5 of the order. Section 5 provides that "[n]othing in this Order shall apply to any claim concerning the validity or payment of a standby letter of credit, performance or payment bond or other similar instrument." Exec. Order No. 12294, § 5, 3 C.F.R. 139, 140 (1982). The accompanying regulation, 31 C.F.R. § 535.222(g) (1984), while exempting these claims, also provides that "assertion of such a claim through judicial proceedings is governed by the general license in [31 C.F.R.] § 535.504." *Id.* This regulation provides that, except for claims that are suspended pursuant to the Accords as provided in section 535.222(a), all other claims against Iran or its property may proceed. 31 C.F.R. § 535.504(a) (1984). However, the regulations do not authorize "[a]ny final judicial judgment or order (A) permanently enjoining, (B) terminating or nullifying, or (C) otherwise permanently disposing of any interest of Iran in any standby letter of credit, performance bond or similar obligation." *Id.* § 535.-504(b)(3)(i).

In *Itek Corp. v. First National Bank of Boston,* 511 F.Supp. 1341, 1347 (D.Mass. 1981), *vacated,* 704 F.2d 1 (1st Cir.1983), the district court concluded that despite the parties' intent in the Accords to terminate litigation on matters including letters of credit, *see* Claims Declaration art. II, ¶ 1, the Executive's interpretation of the Accords as expressed in section 5 of the Executive Order, exempting litigation on standby letters of credit, was binding. While on appeal, the Treasury Department amended section 535.504 into its present form, and the First Circuit concluded that while the amendment precluded a *final judgment* on the letter of credit, it did not preclude *preliminary injunctions* or other temporary relief. *See Itek Corp. v. First National Bank of Boston,* 704 F.2d 1, 9–12 (1st Cir.1983) (vacating *permanent* injunc-

tion as a final disposition within the meaning of the regulation). Thus, the First Circuit concluded implicitly that despite the "agrees to terminate" language in the Accords, the Executive's exception did not prohibit the assertion or litigation of claims under section 5 of the Order. Iran has advanced no reason why section 6 of the Executive Order should be treated differently; indeed, the regulations are far more liberal with respect to counterclaims. *See* 31 C.F.R. § 535.504(b)(3)(ii) (1984). Since we can ascertain no principled distinction between sections 5 and 6 of Executive Order No. 12294 for purposes of whether they conflict with article II of the Claims Declaration, we find the First Circuit's position persuasive and conclude that it should be followed.

### B.

■ The second aspect of Iran's claim is whether this case meets the requirements of section 6 of the Executive Order and the regulations. Section 6 requires that the counterclaim be asserted in a "judicial proceeding pending or hereafter commenced by the Government of Iran." The regulations echo that requirement. *See* 31 C.F.R. §§ 535.222(b), 535.504(b)(3)(ii) (1984). Iran argues that no action was "pending" in the district court because a summary judgment against Iran had been issued and was on appeal when the Accords became effective. This argument, however, ignores the fact that LSC's compulsory counterclaim had not yet been decided. Indeed, the district court retained jurisdiction over the matter and the summary judgment was subject to modification and reconsideration. Even though the summary judgment was on appeal, we could have reversed or vacated the judgment and remanded the case to the district court. In fact, we dismissed the appeal, thus leaving the case in the district court subject to further action. Although Iran argues that "pending" should be interpreted as a matter of "fairness," its interpretation of the term means that nothing is pending when an interlocutory appeal is taken—a result that we find inconsistent with the civil rules and with common sense.

■ Iran also argues that the Accords, Executive Order, and regulations permit the assertion only of compulsory counterclaims. As the district court observed, more than one interpretation of the Executive Order and regulations is reasonable on this issue. Neither the Executive Order nor the regulations distinguish between compulsory and permissive counterclaims. The Accords, however, mention that the parties may bring compulsory counterclaims against plaintiff-nationals in the Tribunal. Claims Declaration art. II, ¶ 1. To interpret the counterclaim rules as Iran suggests, however, would be to suspend Fed.R.Civ.P. 13(b) whenever Iran chooses to commence an action in the United States. We conclude that this interpretation is not consistent with the Accords because the Accords have no effect on actions brought by a party in the courts of the other party. Moreover, the Tribunal has indicated that by suing in the United States, Iran "must be taken to have accepted its procedural rules." *Boeing Co. and Islamic Republic of Iran*, Award No. ITM 38–222–1, at 5, Case No. 222 (Chamber 1 May 25, 1984). Since the distinction between compulsory and permissive counterclaims is apparent in the Accords but not in the Executive Order or regulations, we conclude that the most reasonable interpretation of these authorities is that neither the United States nor Iran intended to limit counterclaims when a party commences an action in the courts of the other party. Thus, we conclude that the Accords and Executive Order permitted the assertion of these permissive counterclaims.

### IV

Next, we must consider whether the district court abused its discretion by permitting amendment of the answers to include permissive counterclaims. *See, e.g., Klamath-Lake Pharmaceutical Association v. Klamath Medical Service Bureau*, 701 F.2d 1276, 1292 (9th Cir.), *cert. denied*, 464 U.S. 822, 104 S.Ct. 88, 78 L.Ed.2d 96 (1983). On appeal, Iran asserts several theories in

support of its claim that the district court abused its discretion. However, Iran argued only two theories to the district court: (1) that the defendants delayed too long without excuse, and (2) that Iran was prejudiced because the amendment would interfere with its interlocutory appeal. The argument on which Iran relies heavily on appeal, that Iran incurred prejudice because the revolution prevented Iran from fully responding to the amendments, was not presented to the district court and therefore we decline to consider it. The second theory presented to the district court, interference with the appeal, is no longer applicable because Iran subsequently received a rule 54(b) certification that permitted its appeal. Thus, no prejudice is evident on this theory.

■■■ Therefore, the only issue before us is whether the two-year delay was inexcusably dilatory and, if so, whether the district court abused its discretion in allowing the amendments. Mere delay, by itself, is insufficient and does not raise an inference of prejudice. *See, e.g., Howey v. United States*, 481 F.2d 1187, 1190–91 (9th Cir.1973) (five-year delay by itself is insufficient without affirmative showing of prejudice or bad faith). Boeing asserted that it delayed filing the counterclaims initially because of delicate settlement negotiations. It delayed filing after these negotiations broke down to await the government's settlement of the hostage crisis and any provisions for the continuation of litigation against Iran. Moreover, at least four of the counterclaims could not have been filed with the answer because of circumstances that arose after the initial answer. Our review of the record reveals that Iran presented no evidence of bad faith to the district court. It argues on appeal only that Boeing's and LSC's reasons are insufficient because they amount only to "uncertainty." Thus, we conclude that Iran's argument essentially rests on delay, and that is not enough. Under these circumstances, we conclude that the district court did not abuse its discretion.

■■■ Iran also argues that the district court abused its discretion by not staying the proceeding pending the resolution of a case in the Tribunal. Our review of the record, however, reveals that Iran only asked the district court to *suspend* the claims, not *stay* them. It argued only that the counterclaims were covered by the Accords and section 1 of the Executive Order. Thus, it requested the district court to apply the Executive Order and did not ask for injunctive relief. Moreover, there is no case involving these parties before the Tribunal. The action to which Iran refers is between the two nations, and Boeing's protective filing in the Tribunal does not become active until this case is decided. Since we have concluded that these claims did not have to be suspended under the Accords and Executive Order and in light of the fact that there is no case these parties need await, we conclude that the district court did not abuse its discretion by not suspending these counterclaims.

V

■■■ Iran challenges four aspects of the damage award. The parties are bound by the pretrial order, which states that Washington law applies to the contract issues. Neither party contests the applicability of Washington law. The interpretation of these contractual issues in light of the stipulated facts in the pretrial order presents mixed questions of law and fact, which we review de novo. *See United States v. McConney*, 728 F.2d 1195, 1202–04 (9th Cir.) (en banc), *cert. denied*, —— U.S. ——, 105 S.Ct. 101, 83 L.Ed.2d 46 (1984); *see also Interpetrol Bermuda, Ltd. v. Kaiser Aluminum International Corp.*, 719 F.2d 992, 998 (9th Cir.1983) (interpreting contract is a question of law, but findings about parties' conduct are issues of fact).

A.

Iran first challenges the award of $2,946,000 in excess relocation costs on the emergency relocation of LSC's employees at the end of 1979 and in early 1980. Iran argues that paragraph 2.1.5 of the con-

tract, contained in paragraph 4 of Amendment 12 to the LSC contract, limits the reimbursable expenses to $16,900 per employee. This section provides that:

> In the event the contract is not extended ... the Iranian government shall reimburse LSC for all actual costs associated with the relocation of its employees from Iran to the U.S.A. The actual cost will not exceed $16,900 per employee.

The record reveals that the contract was not extended because the pretrial order states that if Iran had performed, the contract would have terminated on March 20, 1979.

At first blush, therefore, paragraph 2.1.5 applies and limits LSC's recovery to $16,-900 per employee for relocation costs. A close examination of the facts, however, reveals that this is not the case. At the end of 1978 and in early 1979, Iran was in a state of turmoil. Despite this instability, Iran encouraged LSC to maintain its Iranian work force at full strength, and provided the requisite notice to LSC that it wished to renew the contract to March 20, 1980, as it had renewed the contract five times previously. Therefore, the two parties began extension negotiations.

Iran, however, breached the contract by failing to make the monthly payments for November 1978 to January 1979. In January, conditions deteriorated. On January 16, LSC notified Iran that it was invoking article 5 of the contract, the "excusable delay" provision, and conducted an emergency evacuation of its 307 personnel from Iran to other Asian and European cities to await the resumption of Iran's performance obligations and improved safety conditions. During this period, the contract was still effective. When it became clear that the foregoing conditions would not be met, LSC relocated its 307 employees from their temporary Asian and European quarters back to the United States.

Paragraph 2.1.5 by its terms applies only to relocation costs incurred in moving LSC employees from Iran to the United States, and the parties stipulated that it was intended to cover only normal and routine relocation costs associated with the orderly termination of the contract. The parties also agreed that the costs incurred during the evacuation were both "different in nature from, and substantially in excess of" normal relocation costs.

Iran does not dispute LSC's entitlement to the maximum $5,188,000 ($16,900 limit × 307 employees) incurred in relocating its employees back to the United States from Europe and Asia. The only issue is whether the evacuation costs must be recovered, if at all, under paragraph 2.1.5 and thus whether they are subject to the $16,900 limit.

■ We conclude that the evacuation costs are not paragraph 2.1.5 costs subject to the limit. The paragraph by its terms applies only to relocation to the United States. Moreover, the parties agreed that these charges were of a different nature than those contemplated by paragraph 2.1.-5. In addition, the record reveals that LSC evacuated these employees to Europe and Asia, rather than immediately to the United States, because Iran had given notice that it wished to extend the contract and had entered into negotiations to that effect. Thus, the two-stage relocation was the result of LSC's reasonable reliance on Iran's express desire to extend the contract.

■ Although the district court did not rely on this rationale, we may affirm on any ground finding support in the record. *See, e.g., Salmeron v. United States,* 724 F.2d 1357, 1364 (9th Cir.1983). We conclude that because of the conduct of the parties and due to the stipulated intent behind the paragraph, the $2,946,000 is not a relocation expense within the meaning of paragraph 2.1.5.

■ We find, moreover, that another contract provision permits the recovery of these damages. Article 5 of the contract, entitled "Delays" but essentially a *force majeure* provision, provides:

> The price set forth in Article 2 above shall be increased to reflect any increases in cost of performance due to Excusable Delays. LSC will inform the Iranian

Government as soon as practicable after learning of any circumstance which will or has delayed performance under this Contract. The period of performance ... shall not be extended by reason of such Excusable Delays.

"Excusable Delays" are defined in article 5 as one or more of a series of normal *forces majeures*, including wars, strikes, acts of God, failures or acts of the government, etc., provided that these were not due to LSC's fault or negligence.

The parties stipulated that "[t]he conditions existing in Iran in January 1979 satisfied the requirements for ... an excusable delay." It is undisputed that LSC gave proper notice on January 16, 1980 of its reliance on this article for its evacuation and interruption in performance. It is also undisputed that this provision only applies if the contract is in force, and that the contract was in force when the notice was given. Finally, we find nothing in the record that reflects LSC's culpability for these extraordinary events. We conclude that LSC complied fully with article 5, that the damages were the result of LSC's reasonable reliance on Iran's intention to extend the contract, the extension of which would necessitate the return of these employees to Iran, and that article 5 applies generally because the events transpired during the course of LSC's performance. Therefore, LSC is entitled to recover the $2,946,000 in excess relocation costs under article 5 of the contract.

### B.

■ Iran also challenges the district court's award of $903,000 in lost relocation profits. The pretrial order states that LSC and Iran understood that the $16,900 actual cost ceiling per employee in paragraph 2.1.5 "included a profit margin; LSC *had built into the $16,900 figure* a profit margin for LSC." We agree with Iran that the only reasonable interpretation of this paragraph in light of this stipulation is that the parties intended the ceiling to *include* the profit, rather than to be *in addition* to

profit. Otherwise, the attempt to limit the reimbursable relocation expenses would fail because the total amount would turn on the fortuitous circumstance of LSC's previous profit margin. We conclude that only this interpretation gives full effect to both the pretrial order and the contract language. *See Wagner v. Wagner*, 95 Wash.2d 94, 101, 621 P.2d 1279, 1283 (1980) (en banc).

The district court stated that "either interpretation is possible," but awarded the lost profit because "Iran [did] not contest that all sides understood a profit was to be made." This, however, is inconsistent with the stipulation in the pretrial order to the effect that the paragraph referred only to normal and routine relocation costs. We conclude that the parties understood that LSC was to make a profit on a *normal* relocation, but not on an emergency relocation. Since we have concluded, consistent with the pretrial order and the district court's opinion, that the excess relocation costs do not qualify as paragraph 2.1.5 costs, the lost profits should not have been awarded under paragraph 2.1.5. Moreover, article 5, the *force majeure* provision under which the excess relocation costs may be awarded, does not mention profits nor does the pretrial order indicate that they were part of the bargain on this provision. Thus, we hold that the district court erred on this issue and that the amount of the judgment should be reduced by the amount of these damages.

### C.

The district court also awarded Boeing $186,000 in lost volume profits on the resale of $1,092,000 worth of spare parts initially restocked to fill Iran's order that it later repudiated. Iran asserts that Boeing did not meet its burden in the pretrial order to prove that the supply of spare parts exceeded demand, and therefore that Boeing is not entitled to the $186,000 in damages awarded under section 2–708(2) of the Uniform Commercial Code (UCC), Wash. Rev.Code Ann. § 62A.2–708(2) (1966), as a "lost volume" seller. It is true that some

authorities have characterized the typical lost volume situation as one in which supply exceeds demand. *See, e.g., Schiavi Mobile Homes, Inc. v. Gironda,* 463 A.2d 722, 725 n. 6 (Me.1983); J. White & R. Summers, *Uniform Commercial Code,* § 7–9, at 275–76 (2d ed. 1980). The only Washington case on section 2–708(2) did not discuss the issue directly, but stated that a seller had met its burden to show "lost volume" by demonstrating that its products were only "partially completed and there was *no ready market* for them." *Coast Trading Co. v. Parmac, Inc.,* 21 Wash.App. 896, 909 n. 5, 587 P.2d 1071, 1079 n. 5 (1978) (*Coast Trading* ) (emphasis added).

*Coast Trading,* however, involved partially completed goods and did not explicitly address the issue of whether proof of a resale and existing inventory is sufficient to qualify a spare parts supplier for lost volume damages under the second prong of section 2–708(2). We reject Iran's argument, however, that *Coast Trading* and section 2–708(2) require proof of no ready market for the goods. That requirement applies only to sellers that lose volume because they must resell uncompleted goods or fixtures, what Professors White and Summers refer to as "component" or "jobber" sellers. J. White & R. Summers, *supra,* § 7–10, at 276–78. Section 2–708(2) applies to many more kinds of sellers, *see, e.g., Cesco Manufacturing Corp. v. Norcross, Inc.,* 7 Mass.App.Ct. 837, 843, 391 N.E.2d 270, 274 (1979), and we decline to read *Coast Trading* to restrict the application of section 2–708(2) to sellers of partially completed goods.

We conclude that to require proof of a market in which supply exceeds demand would be to require proof of a complex economic relationship that is not required by the subsection because section "2–708(2) is a rather elastic section that will accommodate considerable growth and development." J. White & R. Summers, *supra,* § 7–12, at 282 n. 78. We will not, therefore, impose rigid and complex burdens of proof on this section, particularly in

the absence of relevant Washington law. Until Washington courts hold otherwise, we will apply the majority rule on this issue.

Most other jurisdictions have held that to qualify as a "lost volume" seller under section 2–708(2), the seller needs to show only that it *could have* supplied both the breaching purchaser and the resale purchaser. *See, e.g., Teradyne, Inc. v. Teledyne Industries,* 676 F.2d 865, 868 (1st Cir.1982); *Autonumerics, Inc. v. Bayer Industries,* 144 Ariz. 181, 696 P.2d 1330, 1340–41 (Ariz.App.1984); *National Controls, Inc. v. Commodore Business Machines, Inc.,* 163 Cal.App.3d 688, 696–98, 209 Cal.Rptr. 636, 641–43 (1985). Boeing demonstrated that it would have made the sales to the resale purchaser even if Iran had performed, that Boeing resold the parts, and that it had an existing inventory of these parts. We conclude that the existence of the excess parts inventory alone supports the inference of an oversupply of parts, particularly in conjunction with the fact of resale and the ability to supply both Iran and the resale purchaser. Therefore, we conclude that Boeing satisfied the requirements of section 2–708(2) and is entitled to recover its $186,000 in lost volume profits.

### D.

After Iran repudiated its purchase agreement with Boeing to buy another 747, Boeing resold the aircraft to another customer. Iran argues that the credit memoranda Boeing issued to the resale purchaser should not be used to decrease the net resale price of the aircraft. The pretrial order fixed the value of the credit memoranda at $12,740,000. The gross resale contract price, without the memoranda, was $43,000,000. Iran's original contract price was $51,819,730. Iran's purchase price, however, also was reduced by a $2,863,877 credit memorandum from a gross price of $54,683,250.

Iran's primary objection to the reduced resale price is that the "facts" relat-

ing to the credit memoranda were only those in the pretrial order, and were not "proven" at trial. The pretrial order, however, "shall control the subsequent course of the action unless modified by a subsequent order." Fed.R.Civ.P. 16(e); *accord Heiar v. Crawford County*, 746 F.2d 1190, 1196–97 (7th Cir.1984), *cert. denied,* — U.S. —, 105 S.Ct. 3500, 87 L.Ed.2d 631 (1985). Facts "incorporated in the court's pretrial order ... stan[d] as fully determined as if [they] had been adjudicated after the taking of testimony at trial...." 6 C. Wright & A. Miller, *Federal Practice and Procedure* § 1527, at 605 (1971). The parties agreed to the pretrial order and it was not subsequently modified. Therefore, we conclude that the parties are bound by the facts as stipulated in the pretrial order.

The pretrial order indicates that Iran included a credit memorandum in its computation of the gross original sales price. We conclude that Iran cannot have it both ways—it cannot decrease the original gross sales price by the value of its credit memorandum, and also seek to increase the resale contract price by excluding the value of the resale purchaser's credit memoranda. Despite Iran's protestations that their credit memoranda are valid and allocable while the resale credit memoranda are not, we find nothing in the pretrial order to support that position. Indeed, the pretrial order suggests that the issuance of such memoranda is a normal business practice in most Boeing aircraft sales.

Section 2–706 of the UCC, Wash. Rev.Stat.Ann. § 62A.2–706 (1966), does not define "resale price." Moreover, no Washington court has addressed the issue. Other courts, however, have defined this price to be the amount realized by the seller, net of expenses and other charges. *See, e.g., Burk v. Emmick*, 637 F.2d 1172, 1176 (8th Cir.1980). Professors White and Summers, moreover, expressly state that courts must account for credit terms when determining

the correct resale price. *See* J. White & R. Summers, *supra*, § 7–6, at 266. We conclude that Boeing's contract damages properly reflected the credit memoranda issued to both Iran and the resale purchaser.

## VI

In summary, we affirm the district court's judgment on the counterclaims in light of the Accords, Executive Order, and the Federal Rules of Civil Procedure. We also affirm the damage award, except that the district court erroneously awarded $903,000 in lost relocation profits under the LSC contract. We reverse the judgment as to this element of damages, and remand the case to the district court with instructions to modify its judgment to reflect the omission of this amount.

AFFIRMED IN PART, REVERSED IN PART, AND REMANDED WITH INSTRUCTIONS.