48 F.3d 1227
NOTICE: Ninth Circuit Rule 36-3 provides that dispositions other than opinions or orders designated for publication are not precedential and should not be cited except when relevant under the doctrines of law of the case, res judicata, or collateral estoppel.
 ESTATE OF David SCHWENKE, Plaintiff-Appellant,
v.
STATE FARM FIRE AND CASUALTY COMPANY, Defendant-Appellee.
 No. 93-36156.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted Jan. 12, 1995.
Decided Feb. 27, 1995.
 
 1
 Before: WRIGHT and BRUNETTI, Circuit Judges, and GONZALEZ,* District Judge.
 
 
 2
 MEMORANDUM**
 
 
 3
 The Estate of David Schwenke ("Estate") obtained a $3.6 million judgment against John Becktold in state court. The Estate then sued State Farm Fire & Casualty Co. ("State Farm"), contending that a $1 million general liability insurance policy belonging to Becktold's father also covered Becktold. Following a bench trial, the district court entered judgment for State Farm. We have jurisdiction under 28 U.S.C. Sec. 1291 and affirm.
 
 I. Residence for Insurance Purposes
 
 4
 The central issue in this case was whether John Becktold was a "resident" of his parents' "household" at the time of the accident, so that the insurance policy taken out by his father would cover him. Becktold worked at odd jobs in Billings, Montana, from 1982 until March 1989, when he took a seasonal job as an agricultural laborer at a ranch near Winnett, Montana, about 85 miles from Billings. In October 1989, while still working at the ranch, he had the accident which led to the Estate's $3.6 million state-court judgment against him.
 
 
 5
 It is undisputed that John Becktold's job at the ranch was seasonal and that he would have returned to Billings in October 1989 even if he had not had the accident. It is also undisputed that during the period March through October 1989, he was living at the ranch, did not commute from Billings, and rarely came to Billings.
 
 
 6
 It is also undisputed that while living in Billings before and after the job at the ranch, John Becktold stayed at a number of places, one being his parents' home. See RT 20-21 (admission by Estate). He consistently gave his parents' home as a mailing address. See RT 31 (admission by State Farm).
 
 II. The Disputed Findings of Fact
 
 7
 The key areas of factual dispute are (a) what portion of the time John Becktold stayed at his parents' home compared to other places during the time he was "floating" around Billings before and after the job at the ranch; (b) certain details of the arrangement he had with his parents, primarily whether he kept clothes and other personal possessions at their home and whether he had a room assigned to him there.
 
 
 8
 The district court resolved these disputes by finding that John Becktold spent only a small amount of time at his parents' home, ER 43-45 (findings of fact 20 and 30); that he had no room there, id. at 47 (conclusion of law 7); and that he kept most of his belongings elsewhere, id. We reexamine the evidence supporting these findings to determine if they were clearly erroneous.
 
 
 9
 A. Amount of Time John Becktold Spent at His Parents' Home
 
 
 10
 John Becktold[3] testified as follows at trial when questioned by State Farm's counsel:
 
 
 11
 Q. Can you tell us how much time, total time, during that calendar year of 1989 you would estimate that you spent at 4540 Trailmaster [his parents' house]?
 
 
 12
 A. None.
 
 
 13
 Q. Listen to my question.... Whether it was a visit or whatever you want to call it to 4540 Trailmaster, can you tell us how many days or percentage of time or months or weeks you stayed at 4540 Trailmaster during 1989?
 
 
 14
 [Estate's counsel objects that question has been asked and answered. Court overrules objection.]
 
 
 15
 A. I might have stayed there two, three nights at the most.
 
 
 16
 Q. How about during the year 1988, which was the year before?
 
 
 17
 A. About the same.
 
 
 18
 Q. How about 1987?
 
 
 19
 A. Pretty much the same.
 
 
 20
 RT 265-66. John Becktold's father testified as follows:
 
 
 21
 Q. During 1989 ... can you give us any estimate of the percentage of the year, either in months, weeks, days, whatever it might have been, John stayed at your home at 4540 Trailmaster?
 
 
 22
 A. I wouldn't think it would be a week, or two weeks at the most.
 
 
 23
 Q. Putting all the times together?
 
 
 24
 A. Putting altogether.
 
 
 25
 RT 404.
 
 
 26
 Chris Thom, a friend of John Becktold's, testified that he lived "[k]ind of all over," staying "with me or just with all of his friends." RT 319. Thom also testified that Becktold would stay with his parents "[o]nce in a while," "[n]ot too often," and that he "[m]ight spend the night there." RT 321. Scott Banderob, a former friend of John Becktold's, testified that Becktold would often stay at his home for a week or two at a time. RT 86. He also testified that a week or so after the accident, John Becktold came to stay with him, stayed for a week, and then came back again to stay for a week or so one or more times. RT 88 ("about a week and then he'd go back"), 89 ("[I]t would be a week on or a week off, it kind of varied."). Eugene Iverson testified that John Becktold "just lived everywhere." RT 330.
 
 
 27
 Jim Littleton, an uncle of John Becktold's who lived with Becktold's parents from 1981 to 1987, testified that John Becktold "moved out of the house" shortly after 1981. RT 342-43 ("Once in a while he would stay the night.... Maybe once a month."). Littleton testified that he visited the house "at least daily" in 1989-90, but only saw John Becktold "once in a while," "either leaving or just coming in as I ... come to visit." RT 371-72.
 
 
 28
 In contrast to this evidence supporting the district court's finding, there is also much contrary evidence. There is John Becktold's consistent use of his parents' address as mentioned above. John Becktold stated on some occasions that he was "living" at his parents' home. ER 53, 59 (February 1990 deposition); ER 208 (declaration to police officer in March 1988). His father had also stated that he was "living" there. ER 256-57 (declaration to State Farm in March 1990); RT 414 (statement under oath in July 1990, Pl.'s Ex.34 at 2). Laurel Parsons, John Becktold's adoptive sister, testified that she "often" saw Becktold and his belongings at his parents' home in 1989-90. RT 131-32 ("I seen him there ... [a] lot."). She was visiting their parents' home at least twice a week during that period. RT 133-35. John's brother Ralph testified that after going to live with friends, John would come back to live with his parents. RT 111-12. Scott Banderob similarly testified that after John Becktold's stays at his home ended, Banderob would often drive Becktold back to his parents' home. RT 86. Process was served on John Becktold twice at his parents' home in January 1990. ER 187, 190.
 
 
 29
 There is also evidence tending to cast doubt on John Becktold's credibility and that of his father. In John Becktold's February 1990 deposition, he testified:
 
 
 30
 Q. Were you living at home in 1982 ...?
 
 
 31
 A. Yes.
 
 
 32
 Q. Can you tell me where you've lived in order since that time?
 
 
 33
 A. At my parents' house.
 
 
 34
 Q. You haven't lived anywhere other than your parents' since 1982?
 
 
 35
 A. No.
 
 
 36
 Q. That's been your only residence?
 
 
 37
 A. Yes.
 
 
 38
 ER at 59. Laurel Parsons, Becktold's adoptive sister, testified that Becktold's father had asked her to keep quiet when she was subpoenaed, and that State Farm's lawyer had induced her to sign an affidavit by falsely promising that a statement about where Becktold lived would be changed. RT 135-37. Becktold's father, however, denied having asked her to keep quiet. RT 395. Becktold's father also stated that Becktold stopped being a resident of his house in 1985, RT 405, whereas Becktold himself said that he had left the house "[s]ometime in '83," RT 196, and "[a]round '83 and '84," RT 269. John Becktold also testified that shortly after the accident he lived for a while with Eugene Iverson in Billings, RT 255, but Iverson himself testified that he was in Washington State at the time, RT 327-28.
 
 
 39
 The district court's finding of fact regarding the amount of time John Becktold spent at his parents' home involved difficult credibility determinations, contradictions between witnesses' testimony, and inconsistencies within some witnesses' testimony. Witness demeanor was important in resolving these contradictions. "On matters of credibility ... we will rarely overturn the factual findings of a district court." United States v. Attson, 900 F.2d 1427, 1433 (9th Cir.), cert. denied, 498 U.S. 961 (1990). We cannot say that the district court's finding on this issue was clearly erroneous. See id.
 
 
 40
 B. John Becktold's Relationship with His Parents
 
 
 41
 John Becktold testified that he had no room at his parents' house after 1983, and that he always slept on the couch upstairs when he stayed overnight. RT 198. John Becktold's father stated that "I never had no certain place for anybody except my mother-in-law." RT 429. In contrast, John Becktold's brother Ralph testified that John had a bedroom in the basement, different from Jim Littleton's room. RT 114. Jim Littleton also spoke of "John's room" in the basement and said that he (Jim Littleton) had slept in that room for about six years until 1987. Although John rarely slept at his parents' house, Littleton testified that when he did, he always slept in that bedroom. RT 361. Laurel Parsons spoke of leaving John's clothes on John's bed in "his" room in 1989-90. RT 132-33.
 
 
 42
 John Becktold testified that he kept his clothes at Scott Banderob's home when he stayed with Banderob. RT 201-02. He also testified that he took all his possessions to the ranch when he went there in March 1989, including an inoperable truck. RT 200, 202. His father confirmed this. RT 402. A coworker at the ranch described the possessions he had there as follows: "Well, he had numerous cooking supplies, he had a stereo. He was a real model buff. He had a lot of models and stuff around. He didn't have a whole lot. Odds and ends, he did have some, you know." RT 310. Jim Littleton agreed that even before moving to the ranch, John Becktold kept few or no clothes at his parents' home. RT 361. In contrast, Laurel Parsons spoke of having done laundry for John in 1989-90 at his parents' house. RT 132. She testified that he left some clothes and "toys" at that house when he went to the ranch. RT 144-45. Becktold himself said that his sister "never" did his laundry. RT 225.
 
 
 43
 Again, in light of these contradictions in testimony, we cannot conclude the district court's findings of fact on John Becktold's room and on the location of his possessions were clearly erroneous.
 
 
 44
 III. Application of the Montana Residency Test
 
 
 45
 It is agreed that Montana law governs the insurance policy at issue. In Farmers Union Mutual Insurance Co. v. Blair, 817 P.2d 1156 (Mont.1991), the court construed the phrase "resident of the named insured's household," the precise phrase in the policy relied on by the Estate in this case. The court adopted a four-factor test from Iowa National Mutual Insurance Co. v. Boatright, 516 P.2d 439 (Colo.App.1973). That test considers:
 
 
 46
 the subjective intent of the individual, the formality or informality of the relationship, the existence of another place of lodging by the alleged resident, and the relative permanence or transient nature of the individual's residence in the household.
 
 
 47
 Blair, 817 P.2d at 1158 (emphasis and citations omitted) (quoting Boatright, 516 P.2d at 440). The objective of the test, however, is to determine the intent of the parties to the contract. Id. The Montana court declined to view the term "resident" as an ambiguous term to be construed against the insurer. Id.
 
 
 48
 The Estate contends that the district court's application of these four factors was erroneous. The district court's determination of contractual issues in light of the facts is reviewed de novo. See Islamic Republic of Iran v. Boeing Co., 771 F.2d 1279, 1287 (9th Cir.1985), cert. dismissed, 479 U.S. 957 (1986). "Mixed questions in which the applicable legal standard provides for a strictly factual test, such as state of mind," are reviewed for clear error. United States v. McConney, 728 F.2d 1195, 1203 (9th Cir.) (en banc), cert. denied, 469 U.S. 824 (1984).
 
 
 49
 With regard to the first factor, the court found that John Becktold only spent short periods of time at home after the accident. This strongly supports an inference that, at the time of the accident, he did not intend to return to live there for any significant period of time. Becktold also testified directly that he had no intention of living with his parents after 1983. RT 214. The court's conclusion that the first factor does not favor a finding of residence is thus not clearly erroneous.
 
 
 50
 In applying the second factor, the more intimate and informal the relationship, the more likely it is that residency will be found. See Pamperin v. Milwaukee Mutual Ins. Co., 197 N.W.2d 783, 787 (Wis.1972) ("close, intimate and informal relationship"; cited by Blair ). The district court properly found the relationship to be informal, based on factual findings that Becktold did not help out with expenses or pay rent, did not have a room of his own, had no key of his own, and did not drive any family vehicles.
 
 
 51
 The third factor, the unquestioned existence of alternate residences with Becktold's friends and at the ranch, also favored the ultimate finding that Becktold was not a resident of his parents' household. The fourth factor, permanence or transience, also favored the ultimate finding because Becktold's stays at his parents' home were found to be sporadic.
 
 
 52
 State Farm also argues that under Montana law, the expressed intent of the insured is relevant to deciding whether a particular person was a resident for purposes of an insurance policy. In Continental Insurance Co. v. Bottomly, 817 P.2d 1162 (Mont.1991), decided the same day as Blair, the Montana Supreme Court also interpreted an insurance policy with a clause identical in wording to the one here. It considered statements from the insured in reaching its holding. Id. at 1165.[4] Consequently, it appears that Montana courts would take the stated intent of the insured into account as an additional factor besides the four in Blair. Because the insured testified in this case that he did not consider Becktold a resident, RT 396, taking into account this fifth factor further supports the trial court's decision.
 
 
 53
 The Estate objects also to conclusions of law numbers 11, 12, and 13. These conclusions cite for "general guidance" cases applying the definition of "residence" in Montana Code Sec. 1-1-215, which is in a part of the code entitled "General Definitions of Terms Used in the Code." ER at 47-48. Montana cases have applied this definition solely to construe state statutes, not to construe private contracts.
 
 
 54
 It would have been error for the district court to base its decision primarily on the definition of residence in Sec. 1-1-215, because the Montana Supreme Court in Blair and Bottomly chose not to rely on (or even mention) that definition when construing identical policy language. Also, Bottomly held that a number of relatives time-sharing a vacation home were all residents of one household. Since those relatives presumably had separate non-vacation homes of their own, of which they were also residents, that holding appears to be at odds with Sec. 1-1-215(2), which states that "[t]here can only be one residence." However, because application of the Blair factors suffices to affirm the district court's decision, the district court's reference to Sec. 1-1-215 was at worst harmless error.[5]
 
 
 55
 AFFIRMED.
 
 
 
 *
 The Honorable Irma E. Gonzalez, United States District Judge for the Southern District of California, sitting by designation
 
 
 **
 This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as provided by Ninth Circuit Rule 36-3
 
 
 [3]
 The Estate contended in its reply brief that judicial estoppel should have barred Becktold from changing his testimony, but it concedes that the issue was not put to the district court. The issue is thus regarded as waived
 
 
 [4]
 The Bottomly court did not apply the Blair factors. The policy clause had to be interpreted in a somewhat unusual factual situation. An extended family time-shared a vacation cabin. The cabin burned down when one of the family members visiting it left an electric blanket on "high." 817 P.2d at 1163. The insurer paid the named insured, another family member, and instituted a subrogation suit against the visitors. Id. at 1164. After cautioning that subrogation cases are special, id., and considering the evidence as to intent, the court found that the visitors were insured as "residents of the [n]amed insured's household," id., and thus subrogation against them would not lie, id. at 1165
 
 
 [5]
 The Estate also contends that if there is coverage at all, State Farm is obligated to pay interest on the entire $3.6 million judgment against Becktold, not just on the portion of the judgment falling within the $1 million policy limit. This issue is moot given that we are affirming the district court's holding as regards coverage